### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Robert FALBO, Theresa Billings Falbo, Lorre Meade, Anthony Capricuso, Michael Nardino, Mark Muenster, and Eric Muenster, Defendants.**

No. 92 Civ. 6836 (PKL).

United States District Court, S.D. New York.

Aug. 5, 1998.

Order Modifying Opinion Sept. 8, 1998.

Securities and Exchange Commission, Division of Enforcement, Washington, D.C., Kenneth L. Miller, James A. Kidney, of counsel, for plaintiff.

Morvillo, Abramovitz, Grand, Iason & Silverberg, P.C., New York City, NY, Barry A. Bohrer, of counsel, for defendant Theresa Billings Falbo.

Lawrence J. Groskin, Tuxedo Park, NY, for defendant Lorre Meade.

Robert Falbo, Hobe Sound, FL, pro se.

### OPINION & ORDER

LEISURE, District Judge.

Plaintiff Securities and Exchange Commission (the "SEC") brings this civil enforcement action seeking injunctive and other relief for alleged violations of the laws and regulations governing the trading of securities. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the SEC moves for summary judgment against defendants Robert Falbo ("Falbo") and Lorre Meade ("Meade"). For the reasons stated in this

Opinion, the SEC's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I. The Pillsbury Tender Offer

On October 4, 1988, Grand Metropolitan P.L.C. ("Grand Met"), a United Kingdom corporation, announced a tender offer for all the outstanding shares of common stock in The Pillsbury Company ("Pillsbury"), a Delaware corporation with its principal offices located in Minneapolis, Minnesota. Grand Met initially offered $60 per share of Pillsbury common stock. In the three months directly preceding Grand Met's bid, Pillsbury's stock had traded between $34 and $39 per share. Following the announcement of Grand Met's tender offer, the price of Pillsbury's stock immediately leapt from $39 1/8, its trading price on October 3, 1988, to over $57 per share. Grand Met ultimately paid $66 per share of Pillsbury, concluding the acquisition in January, 1989.

### II. The Defendants

#### A. *Theresa Billings Falbo*

Theresa Billings Falbo ("Billings") married Falbo in May of 1988. The record presently before the Court indicates that they remain married. From December of 1986 through June of 1987, and from July of 1988 through January of 1989, Billings worked for Grand Met as an executive secretary for Howard Chandler. Chandler served as Grand Met's Senior Executive Vice President for personnel, legal, and external affairs. Billings and Chandler worked at Grand Met's U.S. headquarters in Montvale, New Jersey.[1] Billings's responsibilities as Chandler's secretary included making his travel plans, preparing expense reports, coordinating meetings, screening calls, maintaining files, taking dictation, word processing, and copying documents. By mid-August of 1988, Chandler and Billings were members of an "inner circle" of Grand Met employees working on the Pillsbury tender offer.[2]

#### B. *Robert Falbo*

From the late 1970's through 1988, Falbo, an electrician, was the sole owner of Earth Electric Company. During 1988, Falbo served as the electrical contractor on the renovations of Grand Met's Montvale offices.[3] He completed some work for Grand Met directly and at other times participated in the project as a subcontractor. Between July and October of 1988, Falbo worked in the Grand Met executive area. Specifically, in August of 1988, he was responsible for electrical work relating to the installation of a key card system limiting access to the third floor of Grand Met's building. The company intended the key card system to prevent those who were not Grand Met employees from accessing the offices of those at the company who were working on the Pillsbury offer. The following month, Falbo handled the electrical work relating to the installation of security doors that were erected to separate those stationed in the third floor executive area (where Billings worked) from other Grand Met employees. Due to his work, Falbo possessed a master key to the Grand Met building in Montvale. With this key, Falbo could enter the building and access the executive area at any time.

While working at Grand Met in August and September of 1988, Falbo visited his wife in the executive area on the third floor. He was aware that she worked for Howard Chandler, that Chandler was a senior executive at Grand Met, and that his wife and Chandler handled confidential matters.

---

1. From July of 1987 through March of 1988, Chandler was reassigned to a Grand Met subsidiary in New York City. Billings remained at Grand Met in Montvale. Soon after Chandler's return to Montvale, Billings resumed working for him.

2. The other members of this select group were: Ian Martin, Chairman of Grand Met's U.S. operations; Deanna Gastaldi, his secretary; Paul Walsh, Chief Financial Officer of Grand Met's U.S. operations; Tina Simonetti, Walsh's secretary; Mary Carroll, Vice President for Public Affairs for Grand Met's U.S. operations; and Barbara Atkinson, Carroll's secretary.

3. Grand Met shared its office building in Montvale with a subsidiary, Inter–Continental Hotels Corporation ("IHC").

### C. *Lorre Meade*

From March of 1988 through January of 1991, Meade worked as a secretary for IHC. Her office at IHC was in the same building as were Grand Met's offices. During the course of their work in the building, Meade and Falbo met and became friends. Meade was aware that Falbo's wife worked for Howard Chandler and knew that Chandler was a Grand Met executive.[4]

### III. Grand Met's Actions Prior to Tendering

Early in 1988, Grand Met began to consider expanding its packaged foods business in the United States. Grand Met soon focused on Pillsbury as a potential target for acquisition.[5] During the spring of 1988, Grand Met retained Swander & Pace, a management consulting firm, to conduct a detailed analysis of Pillsbury. By April, Pillsbury was identified as the primary acquisition candidate in discussions among Grand Met's board of directors. By mid-July of 1988, Grand Met had retained the investment banking firms of Morgan Stanley and S.G. Warburg to assist in the development of a strategy for acquiring Pillsbury. As Grand Met anticipated making a hostile bid for Pillsbury, Grand Met also hired the public relations firm of Robinson, Lake, Lerer & Montgomery. In addition, Grand Met retained the law firm of Cravath, Swaine & Moore ("Cravath"). Cravath advised Grand Met on the legal requirements and strategies relating to the potential acquisition, coordinated the offering process, and agreed to oversee all litigation in the United States relating to a bid.

At a July 13, 1988 meeting with representatives of Cravath and Morgan Stanley, Martin and Walsh established that Grand Met wanted to commence the tender offer for Pillsbury at or about the beginning of September. Lawyers at Cravath began drafting the offer in early August, with the Grand Met board formally approving the acquisition on August 16, 1988. On or about this date, Grand Met and its advisors established a firm plan for the tender offer and its financing. By late August, however, the offer was delayed until September 21. On September 18, Grand Met again postponed announcing the bid, and soon thereafter set the final target date of October 4.[6]

Between mid–August and mid–September of 1988, Grand Met and its advisors considered various offering prices in the range of $55–65 per share of Pillsbury common stock. On September 15, Morgan Stanley recommended setting the offering price at $60 per share. Martin accepted this proposal and presented it to the Grand Met board, which approved on September 30, 1988. Grand Met announced the offer the following week.

Until the announcement of the bid, all those involved in its planning endeavored to keep the project strictly confidential. As an initial precaution, Grand Met used code names to refer to the acquirer and target. Furthermore, Grand Met installed paper shredders in executive offices to help prevent documents relating to the tender offer from circulating outside the inner circle of people working on the project. In addition, the company limited access to the offices of the few people at Grand Met who were involved with the transaction. As mentioned previously, this was accomplished by erecting security walls around certain offices and by setting up a system requiring use of an electronic key card in order to gain entry to the

---

4. Pursuant to separate settlement agreements with the SEC and by stipulation and consent of all interested parties, the Court has dismissed the SEC's claims against the remaining defendants (Anthony Capricuso, Michael Nardino, Eric Muenster, and Mark Muenster). These settlements and dismissals mooted pending motions for summary judgment brought by each of these four defendants.

5. Pillsbury's common stock was registered with the SEC and was listed for trading on the New York Stock Exchange. Options on Pillsbury common stock were traded on the American Stock Exchange.

6. On August 8, 1988, Grand Met announced its intention to sell IHC. The delays in the commencement of the Pillsbury acquisition were caused by Grand Met's desire to complete an agreement to sell IHC prior to announcing plans to acquire Pillsbury. While the two transactions were unrelated, Grand Met was concerned that any controversy surrounding its bid for Pillsbury could scare off a prospective purchaser of IHC.

third floor, where executive offices were located. Most importantly, Grand Met executives severely restricted the number of people at Grand Met who were informed of the company's plans to bid for Pillsbury. The few people who were aware of the potential tender offer were instructed that they were not allowed to discuss the acquisition with anyone outside the inner circle, including members of their families.

In early August, Chandler informed Billings of the project and explained that, as his secretary, she would have access to highly sensitive and confidential information. Having been instructed by Chandler not to discuss the acquisition with anyone, Billings then dealt with a wide range of documents that Chandler needed in connection with the offer. These included documents describing in detail the steps Grand Met would take in commencing the offer, prepared answers to questions that investment analysts were likely to pose about the bid, and statements written in advance for release to the government, investors, and the media. In short, as of early August of 1988, Billings knew of the existence of the planned offer, the identities of the acquirer and target, and the projected timing of the transaction. She also was informed when the offer was delayed and when new dates to go forward were set. In addition, as a member of the inner circle, Billings was privy to information concerning the price per share that Grand Met planned to offer. She was instructed that this information was strictly confidential.

## IV. Rumors of the Transaction

Grand Met and its advisors were not completely successful in their attempt to keep secret the planned offer for Pillsbury. There were a handful of security breaches within Grand Met. First, on June 10, 1988, a copy of the Swander & Pace report on Pillsbury was left out on a copier located on the first floor of the Montvale office building shared by Grand Met and IHC. An IHC employee discovered the copy and returned it to Walsh. Then, ten days later, an accountant in Grand Met's tax department was overheard in the IHC cafeteria commenting that Grand Met planned to sell IHC and use the proceeds to buy Pillsbury. The accountant, Roland Neudert, subsequently received a written reprimand from his supervisor. Finally, Grand Met's facilities manager apparently told his assistant that the renovations limiting access to the executive area were necessary "because they are working on the acquisition of Pillsbury." Deposition of Sharon Moncrieff at 53–54, annexed as Exhibit 5 to the Affidavit of Robert Falbo.

Rumors about Grand Met and Pillsbury also appeared in the media. On three occasions, published reports directly linked the two companies. First, on the August 18, 1988 edition of CNN's "Moneyline" program, commentator Dan Dorfman stated, "[T]oday was the day of the rumor. . . . Let's go on to Pillsbury, up ½. The story there is some people close to Grand Metropolitan apparently are telling people on the Street that Grand Metropolitan is interested in acquiring Pillsbury." Then, three days later, *Investment Dealers' Digest* reported:

> Grand Metropolitan's desire to raise cash quickly [by selling IHC] has fueled speculation that it will launch a bid for a major U.S. food company within the next month. Some analysts in the U.K. believe that the company has targeted Pillsbury, since the Minneapolis-based food processor and fast-food operator meets many of the criteria that Grand Metropolitan has stated it is seeking in an acquisition target.

Evan Simonoff, *Grand Met's Speedy Auction of Hotel Unit Raises Eyebrows*, INVESTMENT DEALERS' DIGEST, August 22, 1988, at 43. Finally, on the September 30, 1988 edition of the "Marketwrap" program on Financial News Network, it was reported, "Now with Grand Metropolitan picking up $2.3 billion from the sale of its Intercontinental Hotel chain, some say Pillsbury could be on its buy list now."

Throughout 1988, there were numerous instances in which it was reported that Pillsbury was an attractive target for a takeover. On other occasions, the business media speculated that Grand Met might attempt to acquire another company. Unlike the reports just noted, none of these other articles linked the two companies. While the Court will not attempt to recount each instance that either

Grand Met or Pillsbury was mentioned in the media in 1988, the Court presents the following quotations as a sample of the kinds of reports that circulated in the six months leading up to the announcement of Grand Met's offer:

> Pillsbury is considered one of the most attractive targets in a food industry already viewed as particularly vulnerable to raiders.[7]

> [A]nalysts say that the management turmoil underscores Pillsbury's weakness to hostile attack. Its stock is well below an estimated breakup value of $50 to $60 a share.[8]

> Among issues mentioned as takeover targets or restructuring candidates, Pillsbury rose 3 7/8, to 42, on very heavy volume. Rumors about Pillsbury have swirled for months, but yesterday traders said that they were more persistent and one brokerage house was said to have accumulated a large position in Pillsbury stock.[9]

> Pillsbury Co.'s problems are far from over. Despite events at the end of last week—the company's latest restructuring announcement, the presumed elimination of Nestle S.A. as a possible raider and Friday's drop in Pillsbury's stock price—industry experts and Wall Street professionals alike believe the company is vulnerable.[10]

> Some takeover players are dead sure that Pillsbury ... will soon find itself embroiled in some fancy dealing. "The company is not likely to remain independent over the next 6 to 12 months. There will be either an unwelcome takeover gambit or a buyout by a white knight," says one big investor.

> Kraft ... is now believed to be willing to play white knight for Pillsbury. Beatrice Chairman Donald P. Kelly ... is whispered to be appraising Pillsbury as his next takeover venture.[11]

> Donald J. Trump, the multimillionaire real estate developer, said yesterday that he had bought 400,000 shares of the Pillsbury Company as an investment.... Mr. Trump said he was seeking Government antitrust clearance to buy nearly 25 percent of the company, the nation's fourth-largest food producer. "I think it's got potential," Mr. Trump said of his investment in Pillsbury.... Mr. Trump [ ] has a record of buying huge blocks of stock in anticipation of major takeovers.... Pillsbury, which is determined to remain independent, has been regarded for months as a prime takeover target.[12]

> Grand Metropolitan P.L.C. said today that it was considering the sale of its [IHC] subsidiary after being approached by several parties. Grand Met, a major liquor and restaurant company based in London, said that a sale would give it more flexibility to pursue it objectives in it core businesses.[13]

These selections demonstrate that media reports containing information and speculation about Pillsbury and Grand Met occasionally appeared in the months preceding the announcement of Grand Met's tender offer for Pillsbury.

## V. Defendants' Securities Trades

Falbo and Meade engaged in a number of trades involving Pillsbury in August and September of 1988, buying both Pillsbury common stock and options to purchase such stock

**7.** Richard Gibson and Richard Johnson, *Back to the Future*, WALL ST. J., March 1, 1988, at A1.

**8.** Pete Engardio, *Are Raiders Getting Hungry for Pillsbury Now?*, BUSINESS WEEK, March 14, 1988, at 36.

**9.** Lawrence J. DeMaria, *Late Rally Sends Dow Up by 16.91*, N.Y. TIMES, March 17, 1988, at D1, D8.

**10.** Richard Gibson, *Pillsbury is Still Vulnerable to Takeover Despite Revamping Moves, Analysts Say*, WALL ST. J., March 21, 1988.

**11.** Gene G. Marcial, *Is Somethin' in the Oven for Pillsbury?*, BUSINESS WEEK, May 23, 1988, at 148.

**12.** Robert J. Cole, *Trump Buys 0.4% Stake in Pillsbury*, N.Y. TIMES, August 2, 1988, at D1.

**13.** *Grand Met May Sell Hotel Unit*, N.Y. TIMES, August 9, 1998, at D4.

at a certain price at a later date.[14] The following table summarizes defendants' purchases:

| DEFENDANT | DATE | PURCHASE | COST |
|---|---|---|---|
| Falbo [15] | August 8 | 500 shares | $18,937.50 |
| | September 2 | 500 shares | $17,437.50 |
| | September 15 | 50 October 40 calls | $ 4,375.00 |
| | September 15 | 30 October 30 calls | $ 3,562.50 |
| Meade | September 2 | 60 shares | $ 2,100.00 |
| | September 15 | 20 October 40 calls | $ 2,375.00 |

These purchases deviated from defendants' prior investment histories. Neither Falbo nor Meade ever had purchased an option contract prior to these trades. Moreover, Meade had not engaged in any securities transaction since 1981 (when she sold some stock from her employee stock plan at TRW, for whom she worked at the time). Finally, the cost of Falbo's purchases of Pillsbury securities was more than four times greater than the cost of any of his previous securities purchases.

By January 6, 1989, Meade and Falbo had liquidated their positions in Pillsbury. In total, Falbo realized over $165,000 in profits from trading Pillsbury securities. Meade's total profits from her purchase and sale of Pillsbury securities exceeded $35,000.

## VI. Subsequent Events

The SEC initiated an investigation of these trades almost immediately, with an SEC lawyer calling Capricuso on October 5, 1988. On September 16, 1992, a lengthy investigation culminated in the filing of a Ten–Count Indictment naming Falbo and Capricuso as defendants in a criminal action for securities violations and conspiracy to commit such violations. Following a ten-day trial in May,

1993, before the Honorable Pierre N. Leval, a jury acquitted Falbo and Capricuso on all charges.

On the same day as the criminal Indictment was filed, the SEC filed in this Court a civil Complaint alleging violations of the laws governing the trading of securities. The SEC seeks injunctive and other equitable relief. The SEC brings this action pursuant to the authority conferred upon it by §§ 21(d), (e) of the Securities Exchange Act of 1934 (the "Exchange Act"). *See* 15 U.S.C. §§ 78u(d), (e). Now before the Court is the SEC's motion for summary judgment against defendants Falbo and Meade.

## DISCUSSION

### I. Applicable Standards

A. *Summary Judgment*

The moving party is entitled to summary judgment only if the Court determines that there exists no genuine issue of material fact and that based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Holt v. KMI–Continental Inc.*, 95 F.3d 123, 128 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23,

---

**14.** Such options are referred to as "calls." "[A] call option on a certain stock gives the holder the right to buy that stock at an agreed price [*i.e.*, the "strike price"] within a specified time...." *SEC v. Wang*, 944 F.2d 80, 83 (2d Cir.1991) (Cardamone, J.). A single call entitles its holder to purchase 100 shares of stock. The purchaser of a call option "essentially is betting that the market price will rise over the strike price within the

limited time period." *U.S. v. Grossman*, 843 F.2d 78, 81 n. 1 (2d Cir.1988).

**15.** Falbo registered in the name of his married daughter, Cheryl Werntz, the 1000 shares of Pillsbury stock he purchased. In addition, Falbo's two options purchases were conducted through Capricuso's and Meade's accounts, respectively.

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548); *see also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1231 (2d Cir. 1996). The Court's function on a motion for summary judgment is not to try issue, of fact, but rather to determine whether there exists a genuine issue of material fact to be tried. *See Sutera v. Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir.1995). In determining whether there exists a genuine issue of material fact, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt*, 95 F.3d at 129.

### B. *Section 10(b)*

█ Section 10(b) of the Exchange Act provides that it shall be unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b). Pursuant to that mandate, the SEC promulgated Rule 10b–5, which provides that it shall be unlawful:

(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To establish that a defendant violated § 10(b) and Rule 10b–5, the SEC must show:

(1) a misrepresentation, or an omission (where there is a duty to speak), or other fraudulent device; (2) in connection with the purchase or sale of any security; (3) scienter by the defendant in making that misrepresentation or omission; and (4) materiality of that misrepresentation or omission.

*SEC v. Tome*, 638 F.Supp. 596, 620 (S.D.N.Y. 1986) (internal citations omitted).

In the instant case, the SEC claims that Falbo and Meade are liable under the "misappropriation" theory of Rule 10b–5. As the Court of Appeals for the Second Circuit recently reiterated:

In contrast to the traditional theory of insider trading, under which a corporate insider trades in the securities of his own corporation on the basis of material, non-public information, under the misappropriation theory § 10(b) and Rule 10b–5 are violated whenever a person trades while in knowing possession of material, non-public information that has been gained in violation of a fiduciary duty to its source.

*U.S. v. Cusimano*, 123 F.3d 83, 87 (2d Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998) (citing *U.S. v. Mylett*, 97 F.3d 663, 666 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997)). The Supreme Court has stated:

Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information.

*U.S. v. O'Hagan*, 521 U.S. 642, ——, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997). As Judge Milton Pollack noted over a decade ago:

Frequently, the misappropriation theory will hold liable those persons breaching a duty of trust and confidentiality to a tender offeror. Indeed, insiders of a tender offeror, because they are often the only ones with advance knowledge of an im-

pending hostile tender offer, are the ones most likely to trade (or tip) on nonpublic information regarding a hostile tender.

The problem of insider trading on tender offers has become particularly acute, especially in conjunction with the greater availability of option contracts. Persons with advance knowledge of a tender offer announcement have opportunities to profit substantially in a short time with little or no risk of loss. These opportunities can be greatly maximized on the options market because the value of an option contract tends to increase by a much greater percentage than the value of the underlying stock.

*Tome*, 638 F.Supp. at 619–20.

 Under the misappropriation theory of Rule 10b–5, primary liability attaches to one who "misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *U.S. v. Chestman*, 947 F.2d 551, 566 (2d Cir.1991) (*in banc*). Though liability under Rule 10b–5 cannot be based solely on trading while in possession of material non-public information, "tippee" liability attaches where "an 'insider has breached his fiduciary duty . . . by disclosing the information to the tippee and the tippee knows or should have known that there has been a breach.'" *Id.* at 565 (quoting *Dirks v. SEC*, 463 U.S. 646, 660, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)); *see also U.S. v. Libera*, 989 F.2d 596, 600 (2d Cir.1993).

### C. *Section 14(e)*

Section 14(e) of the Exchange Act provides, in relevant part:

It shall be unlawful for any person . . . to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer. . . . The [SEC] shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e). Relying on the authority granted in § 14(e), the SEC promulgated Rule 14e–3(a), which provides:

(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the [Exchange] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

(1) The offering person,

(2) The issuer of the securities sought or to be sought by such tender offer, or

(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e–3(a). In *O'Hagan*, the Supreme Court held that Rule 14e–3(a) represented a valid exercise of the SEC's rule-making authority under § 14(e). *See O'Hagan*, 521 U.S. at ——, 117 S.Ct. at 2214. As the *O'Hagan* Court noted:

One violates Rule 14e–3(a) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired "directly or indirectly" from an insider of the offeror or issuer, or someone working on their behalf. Rule 14e–3(a) is a disclosure provision. It creates a duty to those traders who fail within its ambit to abstain or disclose, *without regard to whether the trader owes a pre-existing fiduciary duty* to respect the confidentiality of the information.

*Id.* at 2215, 117 S.Ct. 2199 (emphasis in original) (quoting *Chestman*, 947 F.2d at 557).

Finally, the SEC alleges that Falbo and Billings violated Rule 14e–3(d), which provides, in relevant part:

(d)(1) As a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e) of the [Exchange] Act, it shall be unlawful for any person described in paragraph (d)(2) of this section to communicate material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section except that this paragraph shall not apply to a communication made in good faith, ...

(2) The persons referred to in paragraph (d)(1) of this section are:

... (iv) Any person in possession of material information relating to a tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from [the offering person or its officers, directors, employees or advisors].

17 C.F.R. § 240.14e–3(d).

## II. The SEC's Motions for Summary Judgment

### A. *Local Rule 3(g)*

The Second Circuit has explained:

Pursuant to 28 U.S.C. § 2071(a) and Rule 83 of the Federal Rules of Civil Procedure, district courts have the power to enact Local Rules governing their practice, procedure, and conduct of business. Local Rules have the force of law, to the extent that they do not conflict with rules prescribed by the Supreme Court, Acts of Congress, or the Constitution.

*Somlyo v. J. Lu–Rob Enterprises, Inc.*, 932 F.2d 1043, 1046 (2d Cir.1991) (internal citations omitted). Local Civil Rule 3(g) ("Rule 3(g)") of the Joint Rules of the United States District Courts for the Southern and Eastern Districts of New York provides:

Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Rule 3(g).[16]

In support of its motions for summary judgment and in compliance with Rule 3(g), the SEC submitted a detailed "Statement of Material Facts Not in Dispute" (the "SEC Statement"). The SEC Statement totals 197 paragraphs and 40 pages. In response, Meade (who is represented by counsel in this action) submitted a "Statement of Genuine Issues of Material Fact" consisting of two conclusory paragraphs covering less than one-half of one page.[17] Meade therefore has failed to controvert the material facts set forth in the SEC Statement, as required by Rule 3(g). Accordingly, the Court deems Meade to have admitted those facts.

Similarly, Falbo (who appears *pro se*) has not controverted most of the facts alleged by the SEC to be undisputed. Falbo submitted a "Statement of Undisputed Facts in Re-

---

**16.** Effective April 15, 1997, Rule 3(g) was renamed Rule 56.1. The substance of the rule was unchanged in all material respects. As the parties' statements were filed prior to the effective date of the change, the Court in this Opinion refers to the rule by its former designation.

**17.** Meade asserts therein that only two facts are in dispute: (1) whether she purchased 60 shares of Pillsbury based on material non-public information or based on gossip, rumor, "street talk", and media reports; and (2) whether she purchased 50 Pillsbury options contracts based on material non-public information or based on Falbo's guarantee that he would cover any loss to her as a result of her purchase of the calls.

sponse to SEC's Motion" containing 19 paragraphs and 17 pages. In this statement, Falbo did not respond to the undisputed facts set forth in the SEC Statement; rather, he merely presented those facts that he believes are undisputed. While such a statement would have sufficed had Falbo been the movant:, Falbo has failed to adhere to the clear, uncomplicated requirements of Rule 3(g). Therefore, except to the extent that they are controverted in Falbo's statement, the Court deems Falbo to have admitted the facts set forth in the SEC Statement.[18] *See SEC v. Musella,* 678 F.Supp. 1060, 1061 (S.D.N.Y. 1988) (deeming admitted facts from movant's 3(g) statement where non-movants failed to submit separate 3(g) statements in response). The Court relied on these undisputed facts both in setting forth the factual background of the action and in adjudicating the merits of the SEC's motion for summary judgment.

### B. *Falbo*

#### 1. *Section 10(b)*

As explained, *supra,* a defendant is liable under the misappropriation theory of § 10(b) and Rule 10b–5 when he trades while in knowing possession of material non-public information that has been obtained in violation of a fiduciary duty to its source. *See Cusimano,* 123 F.3d at 87. Applying this standard to the instant motion, the Court finds that the SEC is entitled to summary judgment against Falbo in connection with his final three purchases involving Pillsbury, but not with regard to his purchase of Pillsbury common stock on August 8, 1988.

#### a. *Materiality*

■ The applicable standard of materiality is well-settled. As the Second Circuit has explained:

> [I]n order for information to be "material" for purposes of § 10(b) and Rule 10b–5, there must be a substantial likelihood that a

reasonable investor would view it as significantly altering the "total mix" of information available. This inquiry is guided both by the probability that an event will occur and the anticipated magnitude of the event relative to the totality of the company's activity.

*Id.* at 88 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, takes on an added charge just because it is inside information." *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997) (internal quotation omitted).

■ Applying this standard to the instant case, it is clear that Falbo possessed material information. During social visits between Falbo and Billings and Simonetti and her husband, Billings and Simonetti talked about how exciting it was to work on an acquisition. *See* SEC Statement ¶ 65. Having been alerted that Grand Met planned to acquire some other company, Falbo then ascertained the identity of the target. In order to obtain information about the acquisition, Falbo eavesdropped on Grand Met executives while he worked on the renovations to the executive area. *See* SEC Statement ¶ 66. In August of 1988, Falbo overheard Mary Carroll on the telephone discussing Burger King, a Pillsbury subsidiary. From that conversation, Falbo determined that Grand Met was attempting to acquire Pillsbury. *See id.; see also* Deposition of Robert Falbo ("Falbo Dep.") at 62–63, annexed as Exhibit F to the Declaration of Deborah Meshulam ("Meshulam Dec."). Prior to August 8, 1988, Falbo had visited Grand Met's library, looked in Standard & Poor's, and discovered both that Pillsbury owned Burger King and that Pillsbury's headquarters were located in Minneapolis. *See* SEC Statement ¶ 68.[19]

---

18. In enforcing the clear provisions of the Local Rules, the Court is not prejudicing Falbo based on some arcane technicality. Rather, the facts in the SEC Statement not only are not disputed in any 3(g) statement from Falbo, but also are supported by the undisputed record before the Court. This extensive record includes party and non-party depositions, testimony from the prior criminal trial of Falbo and Capricuso, and numerous exhibits. Therefore, the Court's reliance on the SEC Statement in no way represents unduly harsh treatment of a *pro se* litigant.

19. At his deposition, Falbo stated that he overheard Mary Carroll on or after August 20, 1988. *See* Falbo Dep. at 62. Therefore, there exists a genuine issue of disputed fact as to when Falbo first obtained this information.

Falbo also obtained material information from his wife. After hearing Dorfman's comments concerning Grand Met and Pillsbury on the August 18 "Moneyline", Falbo asked Billings to confirm the rumor. Billings responded that Falbo could draw his own conclusions, that it was none of his business, and that he could not trade on the information because of Billings's status at Grand Met. From this comment, Falbo easily inferred that Grand Met in fact was seeking to acquire Pillsbury. *See* Falbo Dep. at 50–51. In other conversations with his wife, Falbo learned when Grand Met executives were traveling to Minneapolis, where he knew Pillsbury was headquartered. He obtained this information by asking questions of Billings. *See* SEC Statement ¶ 69.

Falbo knowingly possessed material information about Pillsbury. By the end of August of 1988, Falbo had confirmed with two independent sources within Grand Met's executive department the rumor that. Grand Met planned to acquire Pillsbury. Such information clearly would have been material to a reasonable investor at that time. *See, e.g., Mayhew,* 121 F.3d at 52 (deeming material second-hand information that potential target was pursuing acquirers); *Mylett,* 97 F.3d at 667 (finding material the identity of a potential takeover target); *Tome,* 638 F.Supp. at 622 (confidential tender offer plans, potential targets are material). By late August of 1988, the probability of Grand Met's making a tender offer was significant and the magnitude of the potential transaction, from Pillsbury's perspective, could not have been greater. Thus, Falbo's information that Grand Met was going to offer for Pillsbury was material.

b. *Non–Public Nature of the Information*

■ The material information that Falbo possessed was not public information. "[T]o constitute non-public information under the act, information must be specific and more private than general rumor." *Mayhew,* 121 F.3d at 50 (quoting *Mylett,* 97 F.3d at 666). "Information becomes public when disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group.'" *Mayhew,* 121 F.3d at 50 (quoting *Dirks,* 463

U.S. at 653 n. 12, 103 S.Ct. 3255). However, the Second Circuit has directed that:

> information may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it. The issue is not the number of people who possess it but whether their trading has caused the information to be fully impounded into the price of the particular stock.

*Libera,* 989 F.2d at 601.

Falbo possessed non-public material information concerning Pillsbury. As the Court chronicled in the Background section of this Opinion, the media published a great deal of speculation and rumor about Grand Met and Pillsbury in the six months prior to the announcement of Grand Met's tender offer. On three occasions, reports even linked the two companies directly. However, Falbo possessed information that was more specific and more private than these rumors; he knew that Grand Met was going to attempt to acquire Pillsbury and that Grand Met executives were working on the acquisition. This information was not impounded fully into the price of Pillsbury's stock, as evidenced by the fact that the price per share of Pillsbury's stock increased by almost 50 percent immediately following the announcement of Grand Met's tender offer. Thus, the information that Grand Met intended to acquire Pillsbury was not public information until October 4, 1988.

c. *Breach of Duty*

■ Falbo obtained material non-public information from Grand Met both directly and as a tippee of Billings. To demonstrate that Falbo misappropriated this information, the SEC must show that the information was acquired through a breach of a relationship of trust and confidence. *See Mylett,* 97 F.3d at 667. Billings clearly acquired information about the tender offer by reason of her position at Grand Met. The executives at Grand Met and, by implication, the company's shareholders trusted Billings with extremely sensitive information about the planned tender offer. She was told that the information to which she was exposed as a member of the "inner circle" was confidential; she under-

stood that she was not to discuss it with anyone. *See* Deposition of Theresa Billings Falbo at 57–59, annexed as Exhibit M to Meshulam Dec. By remaining on the project, she accepted a duty of confidentiality; she violated that duty by disclosing to her husband information concerning the transaction. *Cf. Chestman*, 947 F.2d at 571 (proof of acceptance of duty of confidentiality would have established that tipper violated duty of trust and confidence.)

■ The Court determines that: Falbo also had an independent duty not to reveal any information he obtained during the course of his work at Grand Met. Falbo was not a Grand. Met employee, but was a contractor handling the electrical work relating to renovations intended to prevent leaks of information concerning the planned tender offer for Pillsbury. Falbo's association with Grand Met clearly was not one of the traditional relations recognized at common law as inherently fiduciary. *See id.* at 568 (noting that hornbook fiduciary relations include attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder). However, this does not complete the Court's inquiry; under the misappropriation theory, the Court must consider not only whether there existed a fiduciary relationship but also whether there existed a "similar relationship of trust and confidence," which must be the functional equivalent of a fiduciary relationship. The *Chestman* Court noted:

> A fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. What has been said of an agent's duty of confidentiality applies with equal force to other fiduciary relations: an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency. These characteristics represent the measure of the paradigmatic fiduciary relationship. A similar relationship of trust and confidence consequently must share these qualities.

*Id.* at 569 (internal quotation omitted); *see also SEC v. Cherif*, 933 F.2d 403, 410–11 (7th Cir.1991) (concluding that employees have a duty to protect any information with which they are entrusted during the course of their employment, and that this duty continues even after termination).

Grand Met placed Falbo in a position of trust and confidence and he used for personal benefit information obtained during the course of this association. As noted in the Background section, Falbo was entrusted with a master key to the Grand Met building, allowing him to pass at all times through the entrances to Grand Met's Montvale headquarters and through the security doors enclosing the executive area. The key represents property given by Grand Met to Falbo to enable him to serve Grand Met's interests by completing electrical work in connection with the renovations. Grand Met trusted Falbo with the master key and, in so doing, entrusted him with access to all of the offices in the building. Grand Met relied on Falbo to use that access in a manner consistent with Grand Met's interests. Instead, while working in the executive offices, Falbo eavesdropped and overheard Mary Carroll discussing Burger King. Falbo then used this confidential information, which rightfully belonged exclusively to Grand Met's shareholders, for his own gain. Falbo thus violated his duty to Grand Met by using for personal benefit information acquired by him on account of his access to the Grand Met executive area.[20]

---

20. The Court recognizes the irony of Falbo's actions: Falbo misappropriated information about the Pillsbury transaction that he obtained while doing work for Grand Met that was intended to ensure the security of that very information.

### d. *Scienter*

 It is clear from the record that Falbo acted with scienter in trading while in knowing possession of material information obtained in violation of a duty of trust and confidence. The term "scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). While the Second Circuit has held that recklessness satisfies the scienter requirement in the context of a private action pursuant to § 10(b), *see Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.1978), it remains an open question whether recklessness is sufficient in an SEC enforcement action such as the instant case. *See SEC v. Softpoint*, 958 F.Supp. 846, 864 (S.D.N.Y.1997) (Sotomayor, J.) (employing a "knowing misconduct" standard of scienter in a civil SEC enforcement action). This Court follows Judge Sonia Sotomayor's well-reasoned decision in *Softpoint;* as used in connection with this action, scienter is equivalent to knowing misconduct. The existence of scienter, however, may be proven by circumstantial evidence. *See Mylett*, 97 F.3d at 668.

It is beyond cavil that Falbo knew that the information he procured from Billings and Carroll was obtained in breach of a duty of confidentiality. In disclosing material information to Falbo, Billings explicitly warned him that he could not trade on the information because of her status at Grand Met. Moreover, Falbo's actions reveal that he knew that he should not have made his purchases. He bought shares in his daughter's name and purchased Pillsbury options through Capricuso and Meade in order to conceal that the transactions were for Falbo's benefit. *See* SEC Statement ¶¶ 84, 92. He admitted that he was concerned that if his purchases became known, they might have placed Billings's job in jeopardy. *See id.* ¶ 92. In a further attempt to conceal his Pillsbury trading, Falbo had Meade and Capricuso keep the profits from the options transactions until well after the transactions were completed. *See id.* ¶¶ 118–122. In

light of this undisputed evidence, no reasonable trier of fact could fail to find that Falbo acted with scienter in purchasing Pillsbury securities while in possession of material non-public information obtained in breach of a duty of confidentiality.

 The SEC is entitled to summary judgment with regard to Falbo's purchases on September 2 and September 15, 1988. There is no doubt that at the time of those purchases, Falbo knowingly possessed material non-public information obtained in violation of Billings's and Falbo's duties of confidentiality to Grand Met. To be entitled to summary judgment with regard to Falbo's purchase on August 8, the SEC must demonstrate that there exists no genuine issue of fact that Falbo knowingly possessed material misappropriated information at that time. *See U.S. v. Teicher*, 987 F.2d 112, 120 (2d Cir.1993) (adopting "knowing possession" standard of 10b–5 liability). There is not sufficient evidence on the present record for the Court to conclude as a matter of law that Falbo possessed such information on August 8, 1988, when he made his initial purchase of 500 shares of Pillsbury common stock. Therefore, the Court denies the SEC's motion for summary judgment on Falbo's alleged violation of § 10(b) and Rule 10b–5 in connection with his purchase of August 8, 1988. With regard to Falbo's other purchases of Pillsbury securities, the SEC's motion is granted.

### 2. *Section 14(e)*

 The SEC also claims that Falbo violated § 14(e) of the Exchange Act and Rule 14e–3(a) in purchasing Pillsbury securities. To reiterate, "One violates Rule 14e–3(a) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or had reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *O'Hagan*, —— U.S. at ——, 117 S.Ct. at 2215.

 For a trade to violate Rule 14e–3(a), the issuing person must have taken a substantial step or steps to commence the tender offer. *See Chestman*, 947 F.2d at 557. By August 8, 1988, Grand Met had taken

several substantial steps to commence its offer for Pillsbury. Grand Met had retained financial and legal advisers to assist in the preparation of the tender offer and had hired a public relations firm. In addition, Grand Met and its advisers had met to plan the offer, discussing its financing and timing. Each of these actions constitutes a substantial step for purposes of § 14(e). *See SEC v. Musella,* 748 F.Supp. 1028, 1041 (S.D.N.Y. 1989) (retaining law firm is substantial step); *see also Mayhew,* 121 F.3d at 53 (retaining consulting firm, signing confidentiality agreements, and holding meetings of officials clearly satisfies substantial step requirement).

In adjudicating the SEC's motion for summary judgment against Falbo for violations of § 10(b), the Court already has addressed the remaining elements under Rule 14e-3(a). To recapitulate, the Court has found that by mid-August of 1988, Falbo possessed material non-public information that he knew had been acquired from insiders of the offeror, Grand Met. Thus, the SEC is entitled to summary judgment on its claim that Falbo violated Rule 14e-3(a) by purchasing Pillsbury securities on September 2 and September 15. However, as there exists a genuine issue as to whether Falbo possessed the material information as of August 8, 1988, the Court cannot conclude as a matter of law that Falbo's initial purchase of 500 shares of Pillsbury common stock violated Rule 14e-3(a).

■ Finally, Falbo violated Rule 14e-3(d) by tipping Meade. A person violates Rule 14e-3(d) when he communicates to another person material non-public information acquired from an insider relating to a tender offer under circumstances where it is reasonably foreseeable that such communication is likely to result in unlawful trading. *See* 17 C.F.R. § 240.14e-3(d). In the instant case, the Court already has found that Falbo possessed material non-public information obtained from insiders of Grand Met. Falbo told Meade in August of 1988 that Pillsbury

was a takeover target and would make a good investment. *See* SEC Statement ¶ 74. Between September 2 and September 15, he told her that Grand Met was the acquirer and that he was certain it would bid on Pillsbury. *See id.* ¶ 75. It was not merely reasonably foreseeable that Meade would trade on this information; Falbo guaranteed Meade that if she invested in Pillsbury and lost money, he would reimburse her. He even loaned her the money to purchase Pillsbury securities. *See id.* Thus, Falbo violated Rule 14e-3(d), constituting an additional violation of § 14(e) of the Exchange Act.

### C. *Meade*

#### 1. *Section 10(b)*

Meade purchased Pillsbury securities on September 2 and September 15, 1988. As there exist genuine issues of fact concerning the lawfulness of these purchases, the Court denies the SEC's motion for summary judgment insofar as it relates to alleged violations of § 10(b).

#### a. *Meade's Initial Purchase*

■ The Court already has concluded that Falbo possessed material non-public information by mid-August of 1988. Meade admits that between mid-August and September 2, 1988, Falbo told her on at least five occasions that Pillsbury was a takeover target and would make a good investment. *See id.* ¶ 74. However, it remains unclear whether Falbo conveyed material information to Meade as of September 2, because a reasonable jury could conclude based on the present record that Falbo did not inform Meade of the source of his information. Without knowledge as to why Falbo believed that Pillsbury was a takeover target (*i.e.,* because he knew that Grand Met executives were planning a bid), Meade would have known no more than an informed investor who had followed media reports in the preceding months.[21] Therefore, the Court concludes that there remains outstanding a disputed issue of fact concerning whether Meade possessed material information as of September 2.

---

**21.** While a trier of fact could infer from surrounding circumstances (such as Meade's history of securities purchases, or lack thereof) that she did know the source of Falbo's information (and therefore possessed material information), in ad-

judicating the instant motion the Court must draw all justifiable inferences in Meade's favor. *See Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

It also remains unclear whether Meade acted with scienter in buying 60 shares of Pillsbury common stock on September 2, 1988. In reaching this conclusion, the Court reiterates that it employs the "knowing misconduct" standard of scienter utilized by Judge Sotomayor in *Softpoint*, another § 10(b) civil enforcement action initiated by the SEC. *See Softpoint*, 958 F.Supp. at 864. Meade has admitted that in August of 1988, Falbo told her on multiple occasions that Pillsbury was a takeover target. Meade knew both that Billings and Falbo were married and that Billings worked as a secretary for a Grand Met executive, Howard Chandler. *See* SEC Statement ¶ 22. However, a reasonable trier of fact could conclude that as of September 2, 1988, Meade was unaware that Falbo had obtained information in violation of either his or Billings's duty of loyalty and confidence.[22] Accordingly, the Court denies the SEC's motion for summary judgment insofar as the SEC alleges that Meade violated § 10(b) of the Exchange Act in purchasing Pillsbury stock on September 2, 1988.

### b. *Meade's Later Purchase*

■ Meade effected her second and final purchase of Pillsbury securities on September 15, 1988, when she bought 50 October 40 calls.[23] In the short period between her two purchases, Falbo told Meade that Grand Met was going to take over Pillsbury. *See id.* ¶ 75. He also told her that he had obtained this information by eavesdropping in Grand Met's executive offices. *See id.* Finally, Falbo told Meade that it was urgent that she act quickly, as the takeover could be announced any day. *See id.* This information clearly was material; a reasonable investor would have been extremely interested in the fact that Grand Met executives had been overheard discussing an imminent bid for Pillsbury. Thus, the Court concludes as a matter of law that Meade possessed material information at the time of her purchase of Pillsbury calls.

■ Meade's level of scienter in making the later purchase remains a disputed issue

of fact. The Court cannot conclude as a matter of law that Meade knew that the information Falbo relayed to her was obtained in breach of his duty. While he told her that he obtained it by eavesdropping, the present record does not reveal the extent of her knowledge, if any, about Falbo's relationship with Grand Met. For instance, the record does not indicate whether Meade knew that Falbo had been given a master key and enjoyed round-the-clock access to the executive area in connection with his work on the renovations. Thus, drawing all justifiable inferences in Meade's favor, the Court concludes that a reasonable trier of fact could find based on the present record that Meade did not possess the level of scienter required to find her liable for violating § 10(b) in connection with her purchase of Pillsbury calls on September 15, 1988.

The SEC Statement does not contain uncontroverted evidence mandating the opposite conclusion. Paragraph 78 of the SEC Statement provides in full:

> Falbo identified his information sources about the Grand Met offer for Pillsbury as his wife and Grand Met executives. Meshulam Dec. Exh. Q, pp. 19, 39–40, 67–68, 72–75; Exh. R, pp. 24–25; Exh. V, pp. 12, 18–19. He told Meade that he had learned information from Grand Met executives by eavesdropping. Meshulam Dec. Exh. V, p. 12.

As noted, *supra*, Meade has not responded in any meaningful way to the SEC Statement, and therefore under Rule 3(g) is deemed to have admitted the statements of undisputed fact contained therein. In its Reply Memorandum, the SEC relies on her admission of the facts set forth in paragraph 78, among other paragraphs, in an attempt to demonstrate that Meade acted with scienter. *See* SEC Reply 2–4. The first sentence of paragraph 78 is based on Meade's testimony at the criminal trial of Falbo and Capricuso. In the relevant passage, the Government specified that the period of time about which it was asking extended from September 15 to

---

**22.** While a trier of fact also could infer that Meade did know of the breach of duty, based on her knowledge of Falbo's and Billings's work, the Court again draws all inferences in favor of Meade in adjudicating the instant motion.

**23.** Thirty of these calls were for Falbo; Meade borrowed funds from Falbo to purchase the remaining twenty calls for her own benefit. *See id.* ¶¶ 89, 96.

October 4, 1988 (the Government was forced to be specific on this point following an objection by defense counsel and an instruction from Judge Leval). *See* Trial Transcript, direct examination of Lorre Meade at 18–19, annexed as Exhibit V ("Ex.V") to Meshulam Dec. Accordingly, the Court deems Meade to have admitted only that she knew at some point between September 15 and October 4, 1988, that Falbo had obtained information about the planned takeover from Billings. As her trading occurred prior to this period, this admission is irrelevant to the Court's consideration of her knowledge and state of mind in purchasing Pillsbury securities.[24] To summarize, the SEC's motion for summary judgment against Meade for alleged violations of § 10(b) and Rule 10b–5 is denied.

### 2. Section 14(e)

■■■ The SEC also moves for summary judgment against Meade under § 14(e) of the Exchange Act and Rule 14e–3(a). As the Supreme Court emphasized in *O'Hagan,* a person violates Rule 14e–3(a) if he trades while in possession of material non-public information concerning a pending tender offer and he has knows or has reason to know that the information has been acquired directly or indirectly from an insider of the offeror. *See O'Hagan,* 521 U.S. at ——, 117 S.Ct. at 2215. It is irrelevant whether the trader owes a duty to respect the confidentiality of the information. *See id.* As the Court has concluded that there exists a genuine issue of fact as to whether Meade possessed material information on September 2, 1988, the Court denies the motion insofar as it relates to Meade's initial purchase of Pillsbury securities.

■■■ The Court also has determined that at the time of her second purchase, Meade did possess material non-public information obtained from insiders of Grand Met, the offeror. Moreover, is clear that as of September 15, 1988, Grand Met had taken substantial steps toward offering for Pillsbury.

24. The Court notes its disapproval of the SEC's reliance on this testimony in support of its motion for summary judgment against Meade. At best, the SEC's failure to include the time period relating to Meade's admission was sloppy, especially given Judge Leval's specific instruction at trial that the Government specify the period of time about which it was asking. At worst, the

The sole remaining issue concerns Meade's knowledge at the time of the trade. The relevant standard here is much more lenient than that of Rule 10b–5; Meade need only have had reason to know that the information was obtained from an insider. *See id.* Meade admits that Falbo told her as much when he informed her that he had learned of Grand Met's takeover plans by eavesdropping on Grand Met executives. *See* Ex. V. to Meshulam Dec. at 12; *see also* SEC Statement ¶ 78 (second sentence). Therefore, the SEC is entitled to summary judgment on its claim that Meade violated § 14(e) of the Exchange Act when she purchased Pillsbury calls on September 15, 1988.

### D. Remedies

The final issue before the Court concerns the remedies to which the SEC is entitled for those securities violations the Court has found Falbo and Meade to have committed. The SEC requests that the Court force Falbo and Meade to disgorge all wrongful profits, plus prejudgment interest; impose a civil penalty on each defendant; and issue a permanent injunction barring either defendant from committing further violations of the laws governing the trading of securities.

### 1. Disgorgement with Interest

■■■■ The Court has determined that Falbo violated § 10(b) and § 14(e) of the Exchange Act in connection with his purchases of Pillsbury securities on September 2 and September 15, 1988.

> Disgorgement of illicit profits is a proper equitable remedy for securities fraud. Disgorgement is not punitive; it is designed to deprive wrongdoers of the profits of their wrongdoing. Thus, the proper measure of disgorgement is the amount of the wrongdoer's unjust enrichment. In cases of insider trading, the disgorgement normally consists of the full profit derived from the tainted securities transactions.

*Softpoint,* 958 F.Supp. at 867 (internal citations omitted). The Court also must consider whether Falbo must pay interest on any gains he is ordered to disgorge:

> SEC has attempted to lull the Court into believing that Meade has admitted something that she clearly has not. Either way, the Court expects more from the SEC and its counsel. In the parlance of securities fraud, the SEC's failure to state the relevant time frame was a material omission.

The decision whether to award prejudgment interest rests entirely within the equitable discretion of the Court. Like the disgorgement remedy itself, an award of prejudgment interest is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws. In other words, requiring the payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest-free loan procured as a result of illegal activity.

*SEC v. Grossman*, 1997 WL 231167, No. 87 Civ. 1031, *11 (May 6, 1997) (internal citations and quotations omitted).

■ As Falbo has no rightful claim to any benefit from his illegal trading, the Court orders him to disgorge, with prejudgment interest, all profits on his purchases of Pillsbury securities on September 2 and September 15, 1988. Falbo has no right to enjoy any benefit from those transactions, which he knew to violate duties of confidence and for which he has attempted to evade responsibility for almost a decade. In fixing an amount to be disgorged, the Court orders application of the standard non-punitive rate of interest used in enforcement actions (including those for underpayment of taxes). *See, e.g., SEC v. First Jersey Securities, Inc.*, 890 F.Supp. 1185, 1212 n. 36 (S.D.N.Y.1995); *SEC v. Drexel Burnham Lambert, Inc.*, 837 F.Supp. 587, 612 n. 8 (S.D.N.Y.1993). Thus, the Court orders Falbo to disgorge $136,100, plus interest, representing an approximation of his profits on the September trades.[25] *See* SEC Statement ¶¶ 114–15.

These considerations apply to Meade with equal force. The Court has determined that she violated § 14(e) of the Exchange Act when she purchased Pillsbury calls on September 15, 1988. The SEC alleges that Meade's profits from this purchase totaled $34,125. *See id.* ¶ 127. Equity demands that she must be denied any benefit from the transaction. Accordingly, she must disgorge not only her direct profit but also prejudgment interest on that gain. To rule otherwise would allow her to have enjoyed an interest-free loan for almost a decade. Thus, the Court orders Meade to disgorge $34,125, plus interest.

#### 2. Civil Penalties

■ Pursuant to the Insider Trading Sanctions Act of 1984 ("ITSA"),[26] the SEC seeks the imposition of a civil penalty of three times the illicit profits attributable to each defendant's illegal trades.

> In enacting ITSA, Congress sought to remedy the "inadequate deterrent provided by present enforcement remedies for insider trading," and observed that an "injunction ... serves only a remedial function and does not penalize a defendant for the illegal conduct [and][d]isgorgement merely restores a defendant to his original position without extracting a real penalty for his illegal behavior."

*Downe*, 969 F.Supp. at 159 (quoting the Congressional Record). The statute provides that "the amount of such penalty shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase or sale." 15 U.S.C. § 78u(d)(2)(A).

In light of the facts and circumstances surrounding his violations of § 14(e), Falbo's conduct merits the imposition of a civil penalty. Falbo attempted to conceal his trades by trading through others' accounts and in his daughter's name. His behavior evinced a deliberate disregard of statutory and regulatory requirements. He has refused to accept responsibility for his actions. Finally, he unlawfully passed the information on to others, encouraging further illegal trading. However, the Court will not impose the extreme penalty requested by the SEC. In sparing Falbo from the maximum penalty allowed under ITSA, the Court notes that he

---

**25.** As the SEC fails to present any evidence indicating that Falbo derived any financial benefit from the illegal trading of anyone he tipped, the Court declines the SEC's request to hold him jointly and severally liable for anyone else's illicit gains. *See SEC v. Downe*, 969 F.Supp. 149, 158 (S.D.N.Y.1997) (Scheindlin, J.), *aff'd sub nom. SEC v. Warde*, 1998 WL 406851 (2d Cir. July 8, 1998) (declining to force tipper to disgorge tippee profits absent evidence tipper was enriched by tippee trades).

**26.** ITSA was codified at 15 U.S.C. § 78u(d)(2). In the Insider Trading and Securities Fraud Enforcement Act of 1988, codified at 15 U.S.C. § 78u-1, Congress slightly broadened the relevant penalty provision. As the violations at issue here predate the effective date of the 1988 legislation, ITSA applies.

has no prior (nor subsequent) history of insider trading violations, his illicit transactions involved only one company's securities, and he is not employed in the securities industry. The Court thus imposes on Falbo a civil penalty of $50,000. *See Downe,* 969 F.Supp. at 159 (utilizing many of these factors in declining to impose the maximum civil penalty allowable under ITSA).

▮ These factors do not weigh in favor of the imposition on Meade of a significant civil penalty. Meade effected only two trades of Pillsbury securities, did not conceal her trading, did not tip, has no history of insider trading violations, is not employed in the securities industry, and testified at the criminal trial of Falbo and Capricuso as a witness for the prosecution. However, in order to give effect to Congress's intent to provide through ITSA a deterrent to Meade and others against insider trading violations, the Court imposes on Meade a civil penalty of $5000.

### 3. *Permanent Injunctions*

▮ Pursuant to § 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), the SEC requests that the Court exercise its discretion to issue permanent injunctions against further violations of the securities laws by Falbo and Meade. "A permanent injunction against future violations of the securities laws should issue when violations of the federal securities laws have occurred and there is a reasonable likelihood of future violations." *Id.* at 157. Injunctive relief is permissible following summary judgment. *See Softpoint,* 958 F.Supp. at 867. A court should consider several factors in evaluating the likelihood of future infractions, including: (1) the degree of scienter; (2) the isolated or recurrent nature of the infraction(s); (3) the defendant's recognition of the wrongful nature of his conduct; and (4) the likelihood that the defendant will have the opportunity to commit future violations. *See id.; see also Grossman,* 1997 WL 231167 at *13.

The Court grants the SEC's request to enjoin Falbo from future violations of the securities laws. Falbo's violations of the securities laws were flagrant and deliberate. Operating with a high degree of scienter, he traded on insider information for personal gain, passed the information on to others, engaged in a pattern of deception in an attempt to hide his trading, and steadfastly has refused to accept responsibility for his actions. Given this history, the Court finds it reasonably likely that Falbo would avail himself of any future opportunity to violate the securities laws for his personal gain. Therefore, the Court permanently enjoins Falbo from committing any such offenses in the future.

The SEC has failed to demonstrate that it is reasonably likely that Meade will commit future violations of the securities laws. Meade's level of scienter in violating the Exchange Act was minimal, and thus far the Court has found her liable for only a single offense. Nor has the SEC shown that she is likely to have the opportunity to commit future violations. Therefore, at this time, the Court finds it unnecessary to issue a permanent injunction against Meade's committing future violations of the securities laws.

### CONCLUSION

For the reasons stated in this Opinion, the SEC's motion for summary judgment is HEREBY GRANTED in part and HEREBY DENIED in part. Robert Falbo and Lorre Meade are hereby ordered to disgorge certain unlawful profits, with interest, and to pay civil penalties in accordance with this Opinion. Finally, the Court will issue a permanent injunction barring Falbo from engaging in future violations of the securities laws. **SO ORDERED.**

### *ORDER*

In an Opinion & Order dated August 5, 1998 (the "Opinion"), the Court granted in part and denied in part plaintiff's motion for summary judgment. Plaintiff moves to modify the Opinion in two limited respects. Neither modification changes any of the conclusions reached in the Opinion, and the motion is unopposed. For the reasons stated herein, the motion is granted.

In footnote 24 of the Opinion, the Court noted its disapproval of the SEC's reliance on certain testimony in moving for summary judgment. The Opinion should indicate that

the conduct addressed in footnote 24 is not attributable to the lawyers listed as appearing on behalf of plaintiff. Rather, those lawyers, Kenneth L. Miller, Esq., and James A. Kidney, Esq., did not appear in this case until after the motion for summary judgment had been briefed in full.

Plaintiff also points out that the Court of Appeals for the Second Circuit quite recently has clarified the level of scienter that the Securities and Exchange Commission must demonstrate in a civil enforcement action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). In *SEC v. McNulty*, 137 F.3d 732, 737 (2d Cir.1998) and *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir.1998), the Second Circuit indicated for the first time that recklessness satisfies the scienter requirement in a civil enforcement action. This standard controls and clearly applies to the instant case. The record going forward should reflect the state of the law in this regard.

As noted previously, neither of these modifications affects the conclusions the Court reached in the Opinion. However, in an effort to develop the record as fully and accurately as possible, the Court grants plaintiff's motion and modifies the Opinion in the ways indicated.

**SO ORDERED**