UNITED STATES of America, Appellee,

v.

Victor TEICHER, Victor Teicher & Co., L.P. and Ross Frankel, Defendants–Appellants.

Nos. 735, 736, Dockets 92–1301, 92–1302.

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1992.

Decided March 2, 1993.

Andrew L. Frey, Washington, DC (Dan
M. Kahan, Mayer, Brown & Platt, of coun-

sel), for defendants-appellants Victor Teicher and Victor Teicher & Co.

Roger J. Bernstein, New York City (Caryn M. Hirshleifer, of counsel), for defendant-appellant Ross Frankel.

John W. Auchincloss II, Asst. U.S. Atty., S.D.N.Y., Roger S. Hayes, Acting U.S. Atty., John K. Carroll, Reid M. Figel, Asst. U.S. Attys., for appellee.

Before: PIERCE, ALTIMARI and WALKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Victor Teicher, Victor Teicher & Co., L.P., and Ross Frankel appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Charles S. Haight, Jr., *Judge*) following a twelve week jury trial. Teicher and Victor Teicher & Co., L.P. (collectively the "Teicher defendants") were convicted on nine counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.-10b–5 ("Rule 10b–5"), and 18 U.S.C. § 2; two counts of fraud in connection with a tender offer in violation of 15 U.S.C. §§ 78n(e) and 78ff, 17 C.F.R. § 240.14e–3 ("Rule 14e–3"), and 18 U.S.C. § 2; and one count of conspiracy to violate the securities laws and anti-fraud laws, in violation of 18 U.S.C. § 371. Teicher was also convicted on two counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Frankel was convicted on one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, Rule 10b–5, and 18 U.S.C. § 2; one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2; one count of conspiracy to violate the securities laws and anti-fraud laws, in violation of 18 U.S.C. § 371; one count of perjury before the Securities Exchange Commission ("SEC") in violation of 18 U.S.C. § 1621; and, two counts of obstruction of justice in violation of 18 U.S.C. §§ 1505 and 2.

The convictions were the result of an investigation into the trading activities of Teicher in eight separate securities and Frankel in one security after having received material non-public information concerning these securities. Frankel's additional convictions for perjury and obstruction of justice arose from his attempt to conceal his actions which included the destruction of documents pertaining to his trade and his misrepresentations under oath to the SEC. Teicher and Frankel appeal alleging that various errors deprived them of a fair trial.

For the following reasons, the judgments of conviction are affirmed.

## BACKGROUND

The players in this case were involved in the business of arbitrage. Arbitrage entails trading in securities in companies that are the subject of changes in corporate control in order to take advantage of fluctuations in the price of these securities. Teicher, an arbitrageur, formed the Victor Teicher & Co., L.P. investment firm through which he managed investment pools for individual investors. Frankel was a research analyst in the arbitrage department of Drexel Burnham Lambert, Inc. ("Drexel").

Robert Salsbury, a key government witness, worked under Frankel performing financial analyses in the research unit at Drexel. During the same period, Michael David, another key government witness and a close personal friend of Salsbury, worked as an associate in the corporate department of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss"). Like Frankel and Teicher, David was interested in arbitrage.

The government's evidence at trial showed that from December 1985 until March 1986, David regularly provided Salsbury and Teicher with information that David had uncovered concerning possible acquisitions by Paul Weiss clients. David also provided Andrew Solomon, a trader at the brokerage firm of Marcus Schloss, Inc. ("Marcus Schloss") with the same Paul Weiss information he had disclosed to Teicher and Salsbury. Solomon, in turn, provided other confidential information to David who then passed it on to Teicher. The government's evidence also demonstrated that Salsbury had provided Teicher

with the names of companies on Drexel's "phantom list"—a highly confidential list of companies that were the subject of mergers or takeovers by Drexel clients and in which trading by Drexel personnel was prohibited.

Because the factual background underlying the crimes is complex, we present it in some detail.

I. *The Targeted Acquisitions of Paul Weiss Clients*

a. The Triangle Industries bid for American Can

The first tip from David was passed in early February 1986 and involved a possible takeover attempt by Paul Weiss client Triangle Industries of American Can Corporation. David had learned that Triangle Industries was studying the feasibility of the takeover in light of antitrust barriers and that it would occur, if at all, within six months. The information had been given to David by a fellow associate at Paul Weiss. Soon after learning this information, David tipped Teicher that he "had learned within Paul Weiss that American Can at sometime in the future may become a takeover target by a Paul Weiss client, Triangle Industries" and that "if it would happen at all it would happen within six months." David passed along "approximately the same" information to Salsbury and Solomon, among others.

On February 6, 1986, Teicher bought 5,000 shares of American Can common stock and hedged his position by selling 50 call options on the stock. The following day, Teicher "unwound" the transaction by selling the shares and purchasing 50 call options for a one-day trading profit of $1,862.

Salsbury had passed David's information to Frankel. Although no public announcements were made, the price of American Can stock rose sharply, possibly as a result of increased trading activity following David's tipping. According to Salsbury, Frankel was impressed with the increased trading volume and price and urged Salsbury to continue obtaining information from David.

b. The Dominion Textile bid for Avondale Mills

The second tip from David involved a takeover attempt by Paul Weiss client Dominion Textile Inc. for control of Avondale Mills, which was also targeted for acquisition by two other companies. After learning from a corporate librarian that there had been significant activity concerning Avondale Mills, David leafed through the corporate librarian's notebooks and learned of requests for SEC filings and other documents concerning Avondale Mills on behalf of client Dominion Textile. David also learned that Dominion Textile officers were meeting in a Paul Weiss conference room.

On February 21, 1986, David telephoned Teicher and told him that "Dominion Textile is going to make a bid for Avondale Mills." Later that day, Teicher placed an order for 20,000 shares of Avondale stock but was only able to purchase 3,500. On the same day, David tipped Salsbury, who relayed the information to Frankel, and also tipped Solomon who relayed the tip to his boss at Marcus Schloss. Marcus Schloss also purchased Avondale Mills stock.

Three days later, on February 24, Teicher & Co. purchased 9,400 shares of Avondale stock, and on February 26, Teicher & Co. made its final purchase of 1,800 shares of Avondale Mills stock. The next day, Dominion Textile announced its tender offer for Avondale Mills and Teicher sold all his shares of Avondale Mills for a profit of approximately $37,000.

Following the announcement of a competing tender offer from another bidder offering a higher price, David witnessed Dominion Textile officers meeting "day and night" in a Paul Weiss conference room. From this he correctly surmised that Dominion would be making a second bid. David passed on this information to Teicher, Salsbury and Solomon. According to Salsbury, David also told him that he had learned from an associate at Paul Weiss that Dominion Textile "had room" to increase its bid.

On March 14, 1986, Teicher and Co. accounts purchased 9,300 shares of Avondale Mills stock and also sold 3,000 shares that same day. On March 18, Dominion Textile announced a second tender offer for Avondale Mills stock and Teicher began selling his remaining shares for a final profit of $14,000.

#### c. The Ampco–Pittsburgh acquisition of Allegheny International

In early February 1986, David read an entry in the Paul Weiss librarian's notebook concerning a request by a Paul Weiss partner for SEC filings concerning Allegheny International. David later matched the entry's billing code to Allegheny International and told Teicher that Ampco–Pittsburgh was "looking very closely" at Allegheny International. David also tipped Salsbury, and Solomon. On March 7, 1986, while working at Teicher's office, David noticed a sharp increase in price and volume traded of Allegheny stock. David told Teicher "it must be happening." On the same day, Teicher purchased 10,000 shares of Allegheny stock which were sold on March 10 for a profit of $3,300.

#### d. The BAT Industries acquisition of American Brands

In early February 1986, BAT Industries, a British tobacco company, asked its counsel at Paul Weiss to prepare a recommendation concerning the American antitrust environment in connection with its contemplated acquisition of American Brands, an American tobacco company. By reading a list of new business at Paul Weiss, David learned that BAT Industries was considering an acquisition. He learned that the target was American Brands from reading the librarian's request notebook. Beginning on March 8, David relayed the information in stages, as he learned it, to Salsbury. On March 10, David tipped Salsbury, Teicher and Solomon that a takeover bid would be made by BAT Industries for American Brands.

Salsbury testified that sometime before March 10 he had advised Frankel that a takeover of American Brands was contemplated by a Paul Weiss client and that on March 10, he told Frankel that the client was BAT. Also on this day, Salsbury purchased two American Brands options using Frankel's personal Drexel account. Frankel himself purchased 10 call options. Following this purchase, Frankel requested that Salsbury do research on American Brands. Frankel made additional purchases of American Brands options on March 13, and on March 25.

On March 10, Teicher purchased 10,200 shares of American Brands and allowed David to purchase 10 American Brands call options through a Teicher & Co. account. David and Salsbury testified that Teicher would not let David purchase the options in his own name for to do so would be to leave a "smoking gun."

Ultimately, no takeover attempt was made because counsel at Paul Weiss had recommended to BAT Industries that an acquisition would trigger antitrust liability.

### II. *The leveraged buyout of Revco*

In February 1986, Marcus Schloss was approached in connection with a leveraged buyout of Revco, D.S. ("Revco"). From its communications with the buyout group, officers at Marcus Schloss learned that $35 was the highest price the group would pay for Revco stock. On March 11, 1986, Revco announced the buyout and a delay in trading in the stock. Solomon contacted David, who was working at Teicher's office, and told him to sell short some Revco stock since the pre-opening indication was that the stock would trade high and the buyout group would only go to $35. David relayed the information to Teicher telling him that the price "was supposed to go to 35 and only 35." David testified that he believed he had told Teicher that the source of his information was from Marcus Schloss.

Teicher sold short 5,000 shares of Revco stock which he covered later in the day by purchasing 5,000 shares following a $1 fall in the price of the stock. Teicher realized a profit of $4,900.

## III. *The Drexel Phantom List*

In early January 1986, Drexel was hired by Republic Airlines, Inc. in connection with a proposed merger with NWA, Inc., the parent company of Northwest Airlines. Thereafter, Frankel and Salsbury were notified that Republic was added to the Drexel phantom list. Salsbury immediately telephoned Teicher with this information. On January 8, Teicher began purchasing shares in Republic. Teicher ultimately accumulating 23,900 by January 24, when, following the announcement of the merger, Teicher sold his entire position for a profit of $80,000.

In mid-December 1985, Northeast Savings Bank hired Drexel in connection with its contemplated takeover of Westchester Financial Services Corporation ("Westchester Financial"). After learning that Westchester Financial Services had been added to the phantom list on December 26, 1985, Salsbury passed on this information to Teicher. Teicher purchased 2,000 shares of Westchester Financial stock on January 14 which he sold on February 3 for a $1,500 profit.

In March 1986, Drexel was retained by W Acquisition Corporation to assist in an attempted takeover of Warnaco, Inc. When Warnaco was added to the phantom list on March 13, 1986, Salsbury again tipped Teicher, this time on the instructions of Frankel. On March 14, Teicher purchased 20,000 shares of Warnaco stock which he sold for a profit of $40,000 following Warnaco's announcement of a tender offer.

## IV. *The SEC Investigation*

Michael David was arrested on March 26, 1986. The following morning David's roommate called Salsbury at Drexel to tell him that David was missing. That same morning, Salsbury received a call from the SEC during which he was asked "some questions about Michael David, Andy Solomon and American Brands and Avondale Mills stock trading." Salsbury told Frankel about the telephone call and gave Frankel the number of the SEC investigator. Frankel telephoned Drexel's legal counsel and informed him of the SEC's investigation. "Almost simultaneously," Frankel asked Ronald Geffen, a research analyst for Drexel, to retrieve a check and margin slip he had submitted earlier that day to the trading department for a second purchase of American Brands call options for both Frankel and Salsbury. Geffen did so and returned with three copies of the margin slip and the check which was unprocessed. Frankel destroyed the margin slip copies and told Salsbury not to trade in American Brands. Although it is unclear whether Frankel returned Salsbury's check to him, Salsbury maintains that it was never cashed.

Frankel then began discussing with Salsbury how they should explain their interest in American Brands. Frankel rehearsed "four reasons" with Salsbury to tell the SEC and Drexel counsel: (1) Ross Frankel's "father had been in the stock in the past;" (2) that "Ross Frankel liked the company;" (3) that Frankel and Salsbury "did some research to justify the purchase of the options on fundamentals;" and, (4) that Frankel "felt the company's image had been tarnished by tobacco litigation [and] that it was undervalued because of that."

On March 28, 1986, Frankel contacted Geffen from Florida and asked that Geffen destroy a page from his desk calendar. Geffen testified that the page on the calendar was dated either March 26 or March 27 and contained a notation about American Brands reminding Frankel "to get a check from Bob." On April 29, 1986, Frankel wrote a memorandum to Drexel's counsel in which he stated that he had first asked Salsbury to do financial research into American Brands on March 10.

Frankel subsequently testified before the SEC and at trial that he had traded on the basis of a longstanding investment interest in American Brands, prior research, and a takeover "rumor" conveyed to him by Salsbury which did not include its source as originating from Paul Weiss. He points out that another "rumor" of a takeover was published in the *Wall Street Journal* on March 13, the date of his second purchase.

David, Salsbury and Solomon pleaded guilty to conspiracy and related substantive offenses. A thirty-one count indictment was filed against Frankel, Teicher, Victor Teicher & Co., Marcus Schloss & Co., Inc., and D. Ronald Yagoda, a trader at Marcus Schloss. The trial of the Marcus Schloss defendants was severed from that of Teicher and Frankel.

Trial against Teicher and Frankel commenced on January 16, 1990. After various redactions due to the dismissal of certain counts, the indictment presented to the jury contained eighteen counts.

Count one of the indictment charged that from July 1, 1985 to on or about April 30, 1986 defendants Victor Teicher & Co., L.P., Victor Teicher ("the Teicher defendants") and Ross S. Frankel conspired, in violation of 18 U.S.C. § 371, to commit securities fraud, fraud in connection with a tender offer, and mail fraud. Counts two through ten charged the Teicher defendants with securities fraud with respect to certain securities in violation of 15 U.S.C. §§ 78j(b) and 78ff, Rule 10b–5, and 18 U.S.C. § 2. Count eight charged Frankel with securities fraud with respect to one of those securities, American Brands, Inc. Counts eleven and twelve charged the Teicher defendants with fraud with respect to the tender offer by Dominion Textile for Avondale Mills in violation of 15 U.S.C. §§ 78n(e) and 78ff, Rule 14e–3, and 18 U.S.C. § 2. Counts thirteen and fourteen charged Victor Teicher with mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Count fifteen charged Frankel with mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Count sixteen charged Frankel with four specifications of perjury before the SEC in violation of 18 U.S.C. § 1621. Counts seventeen and eighteen charged Frankel with obstruction of justice in violation of 18 U.S.C. §§ 1505 and 2.

On April 6, 1990, the jury returned a verdict of guilty on all counts. Teicher and Frankel now appeal contending, *inter alia,* that the district court improperly excluded evidence of bias by a government witness and, that the district court improperly

charged the jury as to the necessary elements of a securities violation.

## DISCUSSION

### I. *Salsbury's Religious Beliefs*

 Both Teicher and Frankel contend that the district court improperly limited their attempts to impeach Salsbury by demonstrating that he was biased against Jews. Their objection stems from what Salsbury termed "religious thoughts" he had after his arrest but prior to testifying. Outside the presence of the jury, Salsbury testified before Judge Haight that he had a long interest in "Jewish thought, particularly cabalistic thought," and that after he saw the fall of himself and other talented Jewish traders "in the field of making a lot of money" that he came to believe that "there is something to be said for messianic thought." Salsbury concluded that he and other Jewish traders "worshipped money too much and false gods or false messiahs" and "that perhaps there would be repercussions."

> Federal Rule of Evidence 610 provides: Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced.

The rule proscribes the impeachment of witnesses based upon their religious beliefs. *See United States v. Kalaydjian,* 784 F.2d 53, 56 (2d Cir.1986). However, inquiry into religious beliefs "for the purpose of showing interest or bias because of them is not within the prohibition." Fed. R.Evid. 610, advisory committee's note; *see also United States v. Hoffman,* 806 F.2d 703, 708 (7th Cir.1986), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987).

In order to ascertain whether Salsbury's views were probative of bias, Judge Haight asked Salsbury whether anything in his religious views made him feel that he should help in the prosecution of the defendants. Salsbury answered that he did not feel that way, and, in fact, did not wish to testify. Salsbury offered three reasons for

his reluctance: first, it caused him personal disruption and aggravation; second, he considered the Teicher family his friends; and, third, because "one of the cardinal rules is ... Jews aren't supposed to turn other Jews over." Based on this, the district court ruled that Salsbury's messianic beliefs were not probative of bias and therefore were inadmissible under Fed. R.Evid. 610. This conclusion was not only proper, it was in fact compelled by Fed. R.Evid. 610. *See, e.g., United States v. Sampol*, 636 F.2d 621, 666 (D.C.Cir.1980). Accordingly, we do not find the district court's ruling to have been an abuse of discretion. Moreover, we note that in light of the extensive cross-examination of Salsbury which extended over five days and exhaustively covered many bases for impeachment, any additional inferences to be elicited from Salsbury's religious beliefs would have been of only marginal value at best.

## II. *The Jury Charge*

■ Teicher and Frankel contend that the district court's jury charge erroneously instructed the jury that the defendants could be found guilty of securities fraud based upon the mere possession of fraudulently obtained material nonpublic information without regard to whether this information was the actual cause of the sale or purchase of securities. Specifically, Teicher and Frankel argue that the charge permitted the jury to find them guilty of securities fraud even if they had traded upon only publicly available information. We find this argument unpersuasive.

■ Under the misappropriation theory of securities fraud as adopted by this Circuit, "a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir.1991) (in banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *see also United States v. Carpenter*, 791 F.2d 1024, 1028–29 (2d Cir.1986), *aff'd by equally divided court,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *SEC v. Materia,* 745 F.2d 197, 201–02 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). In accordance with the misappropriation theory, the district court instructed the jury:

> The government charges that [the defendants] knowing that information to have been misappropriated, received and exploited that information by using it for their own advantage.

In defining misappropriation, the district court charged:

> To misappropriate, in the context of this case, means to wrongfully take and use the information in violation of a fiduciary duty to hold the information in confidence.

Teicher and Frankel do not contest the propriety of these and similar portions of the charge. Rather, they focus on the part of the charge in which the court instructed:

> The government need not prove a causal relationship between the misappropriated material nonpublic information and the defendants' trading. That is, the government need not prove that the defendants purchased or sold securities because of the material nonpublic information that they knowingly possessed. It is sufficient if the government proves that the defendants purchased or sold securities while knowingly in possession of the material nonpublic information.

Placing great emphasis upon the term "use," they contend that the district court too broadly defined this word as the equivalent of mere possession. They posit the alternative theory that a defendant only "uses material nonpublic information where it can be proven that the trading was *causally connected* to the misappropriated information and hence, was proven *not* to have been conducted on an independent and proper basis." A causal connection standard would find no violation where a trader executes a previously and legitimately planned transaction after the trader wrongfully receives material nonpublic information which confirmed the transaction.

Although this argument is a novel one, the question of whether a violation of Rule 10b–5 requires an actual causal connection between the misappropriated information and the trading has been raised by commentators. *See, e.g.,* 3 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud,* § 7.4 (622), p. 7:160.15 (1992). In support of their position that a causal connection is an element of the violation, Teicher and Frankel rely largely on cases which describe securities charges with phrases such as "trading on the basis of" but which did not address the possibility that the trading was *not* causally connected to the inside information. *See, e.g., Dirks v. SEC,* 463 U.S. 646, 648, 103 S.Ct. 3255, 3258, 77 L.Ed.2d 911 (1983); *SEC v. Materia,* 745 F.2d at 199–200 (2d Cir.1984).

█ In contrast, the government advances the view, which has been consistently endorsed by the SEC, that a violation of § 10(b) and Rule 10b–5 occurs when a trade is conducted in "knowing possession" of material nonpublic information obtained in breach of a fiduciary or similar duty. *See, e.g., Sterling Drug Inc. Investigation,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 81,570, p. 80,298 ("The Commission also believes that Rule 10b–5 does not require a showing that an insider sold his securities for the purpose of taking advantage of material nonpublic information.... If an insider sells his securities while in possession of material adverse non-public information, such an insider is taking advantage of his position to the detriment of the public." (citation omitted)) Rule 14e–3, which prohibits fraud in connection with tender offers explicitly provides a "knowing possession" standard. As the promulgator of Rule 10b–5, the SEC's interpretation that this rule only requires "knowing possession" is entitled to some consideration. *See, e.g., TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n. 10, 96 S.Ct. 2126, 2132 n. 10, 48 L.Ed.2d 757 (1976).

█ A number of factors weigh in favor of a "knowing possession" standard. First, as the government points out, both § 10(b) and Rule 10b–5 require only that a deceptive practice be conducted "in connection with the purchase or sale of a security." We have previously stated that the "in connection with" clause must be "construed ... flexibly to include deceptive practices 'touching' the sale of securities, a relationship which has been described as 'very tenuous indeed.'" *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) (citing *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971) (citation omitted)). Thus, for example, "the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities." *Chestman,* 947 F.2d at 566 (citing *Carpenter,* 791 F.2d at 1032).

█ In addition, a "knowing possession" standard comports with the oft-quoted maxim that one with a fiduciary or similar duty to hold material nonpublic information in confidence must either "disclose or abstain" with regard to trading. *See Chiarella v. United States,* 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). When the fiduciary is an insider who is not in a position to make a public announcement, the fiduciary must abstain. It would be consistent with the "disclose or abstain" rule that a tippee acquire the same duty as his fiduciary tipper.

Finally, a "knowing possession" standard has the attribute of simplicity. It recognizes that one who trades while knowingly possessing material inside information has an informational advantage over other traders. Because the advantage is in the form of information, it exists in the mind of the trader. Unlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain. The individual with such information may decide to trade upon that information, to alter a previously decided-upon transaction, to continue with a previously planned transaction even though publicly available information would now suggest otherwise, or simply to do nothing. In our increasingly sophisticated securities markets, where subtle shifts in strategy can

produce dramatic results, it would be a mistake to think of such decisions as merely binary choices—to buy or to sell.

As a matter of policy then, a requirement of a causal connection between the information and the trade could frustrate attempts to distinguish between legitimate trades and those conducted in connection with inside information. *See* 7 L. Loss & J. Seligman, *Securities Regulation* 3505 (3d ed. 1991) ("The very difficulty of establishing actual use of inside information points to possession as the test.").

In any event, we need only rule with respect to the case before us. Viewing the jury charge in its entirety and based upon the record, we find that it is unnecessary to determine whether proof of securities fraud requires a causal connection, because any alleged defect in the instruction was harmless beyond doubt.

This case involves the fast-paced and perilous world of arbitrage. Arbitrageurs are in the business of gathering information. As described by Teicher, arbitrageurs "combin[e] publicly available information with rumors and other tidbits of immaterial nonpublic information in formulating investment strategies." By their own admission, Teicher and Frankel actively sought and received such "tidbits" in order to weave them into a material whole upon which they traded. It does not follow, that when one such piece of information is revealed to be material, in and of itself, and the trader knows it to be material, the trader might somehow consider the information irrelevant to the whole.

In fact, the question of what Teicher and Frankel believed about the tipped information was properly placed before the jury. Contrary to their assertions, the district court's charge did not preclude Teicher and Frankel from arguing, as they did, that they "never knowingly sought, obtained, or traded upon material nonpublic information from either David or Salsbury." Properly construed, Teicher and Frankel's defense theory was not that they did not *rely* on the material information they knowingly possessed. Rather, they argued that they either did not *know* the information was material and nonpublic or did not *know* the information to be wrongfully acquired. In other words, Teicher and Frankel's defense centered on the strategy that they lacked the requisite scienter to have committed securities fraud.

With regard to scienter, the district court charged:

It is not a willful deceptive device in contravention of Rule 10b–5 for a person to use his superior financial or expert analysis or his educated guesses or predictions or his past practices or experience to determine what stocks to purchase or to sell. Nor is it a deceptive device in contravention of Rule 10b–5 for a person to buy or sell stocks based on rumors, gossip, stories, or any other source consisting of unverified, unsubstantiated information.

Each of the defendants argues that he or it acted at all times in good faith. It is up to you to decide whether that is the case or not. If you decide that the defendant you are considering at all relevant times acted in good faith, it is your duty to acquit him or it, not only on the conspiracy count, but on all counts.

It strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic,—and who did not act in good faith in so doing—did not also trade on the basis of that information. We find that on the facts of this case, no reasonable jury could have made such a distinction. *See Yates v. Evatt*, —— U.S. ——, —— – ——, 111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432 (1991); *United States v. Collins*, 957 F.2d 72, 75 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992).

We have reviewed each of the appellants' remaining contentions and find them to be without merit.

### CONCLUSION

Based on the foregoing, the judgment of the district court is affirmed.