**In re OXFORD HEALTH PLANS, INC., Securities Litigation.**

No. MDL–1222 (CLB).

United States District Court, S.D. New York.

June 8, 1999.

Jay W. Eisenhofer, Grant & Eisenhofer, P.A., by Jay W. Eisenhofer, Wilmington, DE, Patricia M. Hynes, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, by Patricia M. Hynes, Janine Pollock, New York City, Martin D. Chitwood, Christi C. Mobley, John O'Shea Sullivan, Chitwood & Harley, by Martin D. Chitwood, Atlanta, GA, Lead Counsel, for plaintiffs.

Stephen Lowey, Richard B. Dannenberg, Lowey Dannenberg Bemporad & Selinger, PC, by Richard B. Dannenberg, White Plains, NY, Liaison Counsel, for plaintiffs.

Peter J. Beshar, Gibson, Dunn & Crutcher, LLP, by Peter J. Beshar, New York City, for Steven Wiggins.

Maureen C. Shay, Latham & Watkins, by Kenneth Conbog, New York City, for Robert Milligan.

Robert J. Giuffra, Jr., Sullivan & Cromwell, by Gandolfo V. Di Blasi, Robert J. Giuffra, Jr., New York City, for Oxford and officer defendants other than Wiggins, Cassidy and Milligan.

Barry H. Berke, Kramer, Levin, Naftalis & Frankel, New York City, for Andrew Cassidy.

Willkie, Farr & Gallagher, by Richard Klein, Sean Anderson, New York City, for KPMG Peat Marwick.

## MEMORANDUM & ORDER

BRIEANT, Judge.

Presently before the Court in these cases alleging securities fraud, which have been consolidated for pre-trial purposes, *see* May 25, 1999 Memorandum and Order, *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42 at n. 1 (S.D.N.Y.1998), is the motion pursuant to Rule 12(b)(6) and Rule 9(b), Fed.R.Civ.P., of defendants Oxford Health Plans, Inc. ("Oxford"), and the individual defendants Stephen Wiggins, the former Chairman of Oxford's Board of Directors (the "Board") and CEO; William Sullivan, Oxford's President and former CEO; Andrew Cassidy, Oxford's former Executive VP and CFO; Jeffery Boyd, Executive VP and General Counsel; Robert Smoler, former Executive VP and CEO of Oxford's New York Region; David Finkel, former Vice President, Operations; Dr. Benjamin Safirstein, a member of the Board and former Regional Vice President and Medical Director; Brendan Shanahan, Vice President and Controller; Dr. Thomas Travers, former Vice President, Medical Delivery Systems; and Robert Milligan, an outside member of the Board (the "Individual Defendants"). Oxford and the Individual Defendants seek dismissal of the Complaint on the grounds that (1) plaintiffs fail to allege scienter with sufficient particularity under the Private Securities Litigation Reform Act (the "PSLRA"); (2) Oxford disclosed the information allegedly concealed; (3) Oxford's forward-looking statements are protected by the "safe har-

bor" provision of the PSLRA; (4) puffery is not actionable; (5) plaintiffs' § 20(a), 15 U.S.C. § 78t(a), claim fails because plaintiffs fail to allege an underlying violation, and fail to allege any control or participation; (6) plaintiffs' § 20A, 15 U.S.C. § 78t–1, claim fails because plaintiffs fail to allege that each individual defendant was in possession of insider information and that plaintiffs traded on the same day as the individual defendants sold; and (7) plaintiffs' claim on behalf of persons who purchased or sold Oxford options fails because trading in options does not meet the "in connection with" requirement of § 10(b) and no lead plaintiff traded in Oxford options. At the hearing, defendants agreed that the Court need not address the argument with respect to options trading (ground number seven above) at this time. (April 28, 1999 Hearing Transcript at 42).

## FACTUAL BACKGROUND

Plaintiffs are persons and entities who allegedly purchased publicly-traded securities of Oxford during the period from November 6, 1996 through December 9, 1997 (the "Class Period"). Plaintiffs purport to bring this complaint on behalf of themselves and all others who purchased Oxford securities during the Class Period, as well as on behalf of a sub-class of all persons and entities who purchased Oxford common stock contemporaneously with sales by certain individual defendants during the Class Period.

Defendant Oxford is a managed care company that provides its members in New York, New Jersey, Pennsylvania and Connecticut, with comprehensive health care services on a prepaid basis through a network of medical service providers. The individual defendants were at all times during the Class Period officers and directors of Oxford. Defendant KPMG is a firm of certified public accountants that was Oxford's independent auditor from 1985 to 1998.

Plaintiffs allege that Oxford's press releases and SEC filings during the Class Period contained false or misleading information or omitted material information about the accuracy of the Company's earnings and enrollment figures, and its progress in remedying

delays in billing and claims processing associated with a conversion of its computer system. Plaintiffs allege that the Individual Defendants were aware or recklessly disregarded that the financial statements were in violation of Generally Accepted Accounting Principles ("GAAP") and based on inherently unreliable information, that the Individual Defendants were responsible for the dissemination of the false and misleading information, and that the Individual Defendants traded on inside information during the Class Period.

Oxford's 1996 financial statements allegedly violated GAAP for each of the following reasons:

(i) Oxford fraudulently recognized and reported premium revenue; (ii) Oxford failed to adequately reserve for uncollectible premiums receivable; (iii) Oxford fraudulently accounted for its RBNP (reported but not paid) and IBNR (incurred but not reported) claims and thereby materially understated its medical costs payable and health care services expense; (iv) Oxford failed to disclose loss contingencies required to be disclosed by GAAP and SEC regulations; and (v) Oxford was unable to quantify its Class Period premium revenue and health care services expense.

(Complaint ¶ 213). According to the plaintiffs, the 1996 financial statements were based on corrupted and unreliable data because during 1996, Oxford's internal accounting and control systems were in "shambles." Doctors and other medical service providers were not being paid timely; more than half of all claims logged into Oxford's system were not paid within thirty days and many were not paid within sixty days; health care services expenses were mounting; invoices were not sent timely or were sent to persons who were no longer Oxford members; and membership rolls were outdated.

In October 1996, Oracle Corporation ("Oracle"), a computer consulting company, spent two weeks at Oxford and determined that Oxford's computer system was so deficient that Oxford should stop adding functions and related data to it. By December 1996, Oxford had approximately $108 million in suspended claims but could not determine the age and in some instances the source of these claims. Because Oxford was unable to determine how much money it owed to health service providers, it began the extraordinary practice of making providers interest-free loans in the form of cash advances. Providers who were not getting paid and former members who were still being billed began complaining to the New York Attorney General's Office (the "NYAG") and as a result, the NYAG conducted an investigation of Oxford.

Nonetheless, on November 6, 1996, Oxford issued a press release announcing its financial results for the third quarter of 1996 ended September 30, 1996, boasting of Oxford's increased earnings and financial health but saying nothing of the unreliability of the available financial information and accounting data. The press release was attached to a Form 8–K signed by Cassidy and the information in the release was repeated in the Form 10–Q signed by Cassidy and Wiggins. On February 18, 1997, Oxford issued a press release announcing its financial results for the fourth quarter and year ended December 31, 1996, stating that revenues, earnings per share and enrollment figures had increased but again not disclosing the unreliability of the underlying accounting data. This release was attached to a Form 8–K signed by Cassidy and the information in the release was repeated in Oxford's 1996 Form 10–K and annual report. In late February 1997, Oxford claimed falsely that the backlog would be back to normal within six weeks and the conversion problems would be resolved by the second quarter. In the 1996 Annual Report, Wiggins misstated, "by the beginning of March, our backlogs had been reduced and service was returning to normal." On March 12, 1997, Oxford issued a false statement by defendant Sullivan that "Oxford has addressed the computer system conversion issues principally responsible for the delays in claim payments."

On May 5, 1997, Oxford issued a press release falsely representing that Oxford was paying over 85% of new claims in thirty days or less and moving toward its goal of processing over 95% of new claims in thirty days or less, that only 10% of claims processed in

February through April were backlogged claims, and that backlogged claims would be eliminated in sixty to ninety days. Oxford also released misleading representations regarding revenues, expenses, membership levels, and profitability for the first and second quarters of 1997. In an August 1997 interview, defendant Sullivan stated that "we feel like that [computer problem] is behind us right now and we are back to the same levels of performance that we were when we were winning all the general consumer awards and we feel real comfortable and feel that the outlook is very positive." The outlook was not positive.

In October 1997, after an investigation of Oxford's books and other financial and internal control information, the New York State Insurance Department (the "NYSID") informed Oxford that its claims reserves were significantly understated and that its internal accounting controls were virtually non-existent. As a result of the findings made by the NYSID pursuant to the investigation, the NYSID fined Oxford three million dollars and directed that Oxford increase reserves by 50 million dollars, terminate certain management personnel, including the CFO, and remove or replace the two leaders of the KPMG auditing team at Oxford. The Superintendent of NYSID demanded a meeting with Oxford's Board that was scheduled for October 28, 1997.

On October 27, 1997, defendants announced that Oxford would report a loss of $0.83 to $0.88 per share for the third quarter of 1997 rather than the estimated profit of $0.47 per share. Plaintiffs allege that Oxford admitted this only because the NYSID was threatening to go public with its findings. After Oxford's October 27, 1997 announcement, the value of Oxford common stock plummeted 62%.

According to plaintiffs, this October 27, 1997 revelation was not a full disclosure. Oxford continued to misrepresent that it was profitable, that business was stronger than ever, and that its problems were related solely to the implementation of a new computer system, which problems had been resolved. But the problems were not resolved. On December 9, 1997, Oxford announced that

it would be forced to increase its medical claims reserve for New York by $164 million and reported an expected net loss for that quarter of $120 million and a net loss for the year. This time the stock plummeted 15%. Since then, Oxford has reported staggering losses and has taken additional charges to remedy its historically inaccurate financial reporting.

Meanwhile, during the Class Period and before the stock plummeted, the Individual Defendants managed to sell over 1,200,000 shares of Oxford common stock for total proceeds over $78 million.

## DISCUSSION

■ When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal is appropriate only if the plaintiffs can prove no set of facts that would entitle them to relief.

*Section 10b*

■ To state a prima facie case under the Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, plaintiffs must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) upon which plaintiffs relied; and (5) which proximately caused plaintiff's injuries. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 177 (2d Cir.1998); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). Proper pleading of the scienter element under Rule 9(b) and the PSLRA requires that the plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Our Court of Appeals has interpreted this to require the plaintiff either (1) to allege facts showing that the defendant had both motive and opportunity to commit fraud, or (2) to allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Investment*

*Services, Corp.,* 166 F.3d 529, 537–38 (2nd Cir.1999).

■ The factual allegations in the complaint demonstrate that the Individual Defendants were aware of the nature and magnitude of Oxford's computer problems and were aware that Oxford's 1996 financial statements were based on inherently unreliable data. Plaintiffs provide the following examples of the Individual Defendants' knowledge: (1) in April 1996, defendant Wiggins was told by Ken Boyles, the recently hired chief information officer, that the planned computer conversion could not be done reliably; (2) in October 1996, certain members of the Board and management including Wiggins and Sullivan held an emergency meeting and determined that Oxford should hire Oracle to evaluate the failed computer conversion; (3) the Individual Defendants received a report from Oracle dated November 1, 1996, warning Oxford that the computer system was missing critical applications and could not handle any new functions; (4) the Individual Defendants had access to NYSID reports, dating back to 1990, that indicated that Oxford's internal controls and accounting practices were deficient; (5) the Individual Defendants were aware that the magnitude of the increase in Oxford's premiums receivable per member during the fourth quarter of 1996 was unprecedented and highly irregular; and (6) the Individual Defendants were aware that the computer system could not age the premiums receivable or unpaid claims and could not keep current membership data.

Yet Oxford and the Individual Defendants represented to the public that the financial statements were in compliance with GAAP and were reliable evidence of Oxford's continuing growth and profitability. In fact, the financial statements were not reliable indicators because they were based on unreliable data and in reality Oxford was not growing and was not profitable at that time. Despite the misstatements in Oxford's 1996 financial statements, Oxford never restated its 1996

financial statements. Rather it took prospective charges. For the third and fourth quarters of 1997, Oxford had to increase its medical claims reserve by $327 million and had to adjust its revenues by $174 million related to member terminations and non-paying customers. These allegations, taken together, are sufficient to plead the Individual Defendants' knowledge of the falsity of their statements or reckless disregard of a substantial risk of falsity. *See Cohen v. Koenig,* 25 F.3d 1168, 1174 (2d Cir.1994) (finding allegations "that the [defendants] were officers, directors, and majority share holders [and] hands on managers active in [the company's] day to day operations" sufficient to plead knowledge of major corporate problems and therefore knowledge that their financial representations were false); *Cosmas v. Hassett,* 886 F.2d 8, 12–13 (2d Cir.1989) (corporate directors assumed to know of serious problems within the company).

■ As further evidence of the Individual Defendants' scienter, the Individual Defendants during this time sold over 1,200,000 shares of Oxford common stock for total proceeds over $78 million.[1] Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount. *Acito,* 47 F.3d at 54. Trades made a short time before a negative public announcement are suspiciously timed. In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularities and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately $33,000,000. The timing of these trades is "suspicious" enough, along with the other evidence, to support a strong inference of scienter. *See Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 435 (D.R.I.1996) (trades made two months before a negative public announcement sufficiently

---

1. Although plaintiffs generally use evidence of unusual or suspicious insider trades to provide evidence of motive, it is also relevant as evidence of conscious or reckless behavior. *See Fecht v.*

*Price Co.,* 70 F.3d 1078, 1084 (9th Cir.1995); *In re Glenayre Technologies Securities Litig.,* 982 F.Supp. 294, 298 (S.D.N.Y.1997) (Baer, J.).

suspicious in timing to raise strong inference of scienter).

■ There is no guide for determining whether certain insider trades are unusual or suspicious in amount. Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened. *Acito,* 47 F.3d at 54. The $78 million profit from sales by the Individual Defendants during the Class Period is, however, massive by any measure. In addition, each individual defendant sold for large profits: Wiggins for $37,400,000; Cassidy for $5,400,000; Shanahan for $3,100,000; Safirstein for $3,400,000; Smoler for $11,-100,000; Travers for $10,700,000; Sullivan for $2,700,000; Milligan for $2,100,000; Finkel for $1,700,000; and Boyd for $621,000. Other courts have found insider trades suspicious in amount where the defendant sold for far less profit. *See, e.g., Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir.1994) ($760,-599); *Marksman Partners L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1313 (C.D.Cal.1996) (twenty percent of holdings sold for $6.3 million) (citing *Acito,* 47 F.3d at 54).

The Individual Defendants argue that the volume of sales is irrelevant because their sales were a fraction of their total net holdings for the Class Period and were typical of their trades in earlier years. The percentages of holdings sold by the Individual Defendants range from 17% to 67% for trades in November 1996, and from 11% to 100% in August 1997. These are not insignificant percentages. *See, e.g., Marksman,* 927 F.Supp. at 1313 (twenty percent sufficient). In addition, defendants include in their calculation of "holdings" vested options and shares gained by exercising options that were about to expire and otherwise would have been lost. First, vested options are not shares. Second, without more information, this Court cannot evaluate the true value of the options exercised by the Individual Defendants. They may have exercised options to buy at a very low price per share, in which case the shares would have been valuable to the defendants even after the stock plummeted. Finally, "retention of a large position in [the compa-

ny] and . . . pre-announcement purchases [do not] vitiate insider trading liability . . . [where the defendant] realized a profit of over $2 million from his pre-announcement transaction." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris,* 75 F.3d 801, 814–15 (2d Cir.1996). When all of the circumstances surrounding the Individual Defendants' trading are known, they may ultimately defeat the plaintiffs' claims of individual insider trading and fraud. At this point, however, the plaintiffs' allegations of unusually large insider trades at suspicious times are sufficient to create, along with the other allegations, a strong inference of scienter. *See id.*

Defendants also argue that for various reasons, none of the statements alleged in the complaint are actionable under Section 10(b). This Court disagrees.

■ Defendants assert that Oxford revealed its computer problems and their effect on the accuracy of financial statements. It is true that Oxford revealed that it was having some problems with claims processing due to the computer conversion. At the same time, however, Oxford was reassuring the public that the problems were not significant enough to affect profitability and that the problems would be remedied quickly. The computer problems, however, did affect profitability and were not remedied quickly. In fact, Oxford to this day has not fully remedied its computer and internal control problems and continues to take charges and make additions to reserves to remedy prior incorrect financial statements. Also, some of the supposed disclosures were either watered down and misleading or were not disclosures at all. For example, disclosing that computer "issues" had "slow[ed] down" claims payment and premium billing is not the same as saying that computer problems were creating such a backlog that Oxford did not have a current membership list and could not determine the age or source of over $100 million in claims. Disclosing that "administrative expenses" increased "as a consequence of increased costs associated with the conversion of its information systems" has no relation to the fact that problems with the computer conversion caused Oxford to be unable to

determine its major expense, health services expenses. Saying that Oxford's inability to assure the accuracy of estimated expenses incurred but not reported was based on Oxford's "rapid growth" lulls the reader into a false sense of security when the truth is that Oxford could not accurately estimate IBNR because its computerized accounting data system could not provide reliable historical data. And adding boiler plate language to the effect that estimates can never be one hundred percent accurate does not mitigate a failure to disclose the severity of the computer problem.

Defendants asserts that the NYSID reports of 1997 and 1998 undermine plaintiffs' allegations because the NYSID found that the impact of the computer problems on operations was "entirely unanticipated." The NYSID was not investigating fraud; it was investigating regulatory violations, and thus its conclusions are irrelevant to this Court's determination. Moreover, the fact that the impact on operations and on the accuracy of financial statements was initially unanticipated does not mean that the defendants were in the dark about the impact continuously throughout the Class Period.

■ Defendants argue that the safe harbor provision of the PSLRA, 15 U.S.C. § 78u–5, and the "bespeaks caution" doctrine foreclose any liability for Oxford's forward-looking statements accompanied by cautionary language. Defendants do not claim that all of the alleged misrepresentations are forward-looking or that omissions can even be forward-looking. In addition, plaintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements. The safe harbor and bespeaks caution doctrines do not apply to these omissions. Thus, this argument would require the Court to parse out potentially no statements and at most only very few statements while other statements remained in the case to be tried. This is unwise at this stage of the litigation.

■ Defendants assert that any statement prefaced by the word "believes" is puffery or opinion, neither of which is actionable. It is disingenuous to suggest that factual assertions are puffery and opinion that no reasonable investor could reasonably rely on for their truth simply because Oxford claims only to have stated that it believes in their truth. Also, opinions may be actionable under certain circumstances. Our Court of Appeals has held: "Statements regarding projections of future performance may be actionable under section 10(b) or Rule 10b–5 if they are ... supported by specific statements of fact ... or if the speaker does not genuinely or reasonably believe them." *In re International Business Machines Corporate Securities Litig.*, 163 F.3d 102, 107 (2d Cir.1998). "An opinion may ... be actionable ... if it is without a basis in fact ... [or if] the speakers were aware of any facts undermining the accuracy of these statements." *Id.* at 109.

Several of the statements dubbed by the defendants as "beliefs" rely on factual assertions. The statement "The silver lining is that we are a better company for the challenge we overcame" rests on the factual assertion that the company has overcome the challenge. Oxford's "belief" that it is "a very solid company" is supported by the following statement of fact: "We're one of the most financially secure health plans anywhere on the planet." Moreover, inserting the word "belief" before stating, "The fundamentals of our business remain strong," "our business remains profitable," and "Our customers can take comfort in a strong balance sheet with no indebtedness, and with cash and marketable securities and shareholder' equity," does not change the assertive nature of the statements.

There is also evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs, namely the deficient computer system and resultant faulty accounting and financial data. Defendants' "opinions," if they can be called that, thus were not based in fact because the financial and accounting information upon which the opinions were based was completely unreliable. Defen-

dants' statements may therefore be actionable under § 10(b).

 Defendants assert that each individual defendant may be held liable only for misstatements actually made by that defendant because (1) the PSLRA precludes "group pleading;" (2) it is unreasonable to presume in this case that every Individual Defendant joined in a scheme to defraud; and (3) *Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) precludes secondary liability for aiding and abetting a § 10(b) violation. The group pleading doctrine allows plaintiffs to "rely on a presumption that statements in 'prospectuses, registration statements, annual reports, press releases, or other group-published information,' are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Stratosphere Corp. Securities Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998). Our Court of Appeals adopted the group pleading doctrine in *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987), a pre-PSLRA case.

 In *In re Health Management, Inc. Securities Litig.,* 970 F.Supp. 192 (E.D.N.Y. 1997), a post PSLRA case, the court held that neither the PSLRA nor *Central Bank* preclude group pleading or required that each individual defendant actually make the representation. *Id.* at 208–09. The court reasoned:

> Although the Supreme Court has eliminated secondary liability for aiders and abettors of securities fraud, primary liability under Rule 10b–5 may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.' .... Under *First Jersey Securities,* [101 F.3d 1450 (2d Cir.1996), a post-PSLRA case] the plaintiffs need not allege that [a particular defendant] made any fraudulent statements during the Class Period.

*Id.* at 209 (citations omitted). This Court agrees that the PSLRA has not altered the group pleading doctrine and that *Central Bank* has not altered the pleading of primary liability under 10(b) and Rule 10b–5.

Plaintiffs have alleged that group-published documents such as SEC filings and press releases contained fraudulent and misleading statements and omitted material facts. In addition, plaintiffs have alleged that those defendants who did not directly make the fraudulent statements, defendants Smoler and Travers, had knowledge of the fraud and assisted in its perpetration by, *inter alia,* drafting, reviewing and/or disseminating the statements, and keeping silent about the truth while trading on the negative inside information. Thus, the allegations in the complaint suffice to plead § 10b and Rule 10b–5 violations against all of the Individual Defendants. *See Degulis v. LXR Biotech., Inc.,* 928 F.Supp. 1301, 1311–12 (S.D.N.Y. 1996) (denying motion to dismiss because "where, as here, the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of discovery.").

*Section 20(a) (Controlling Person Liability)*

To establish controlling person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), plaintiffs must allege

> a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person. Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

*SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996) (citations and internal alterations omitted).[2]

---

**2.** Plaintiffs argue that the proper standard for pleading a Section 20(a) violation does not include pleading culpable participation in the fraudulent activity. The Court rejects this con-

As discussed above, plaintiffs have plead an underlying violation by Oxford. Defendants Wiggins, Sullivan, Cassidy, Shanahan, Safirstein and Finkel held high-level management positions in which they were involved in the day-to-day operations of Oxford, were aware of the internal control and accounting problems, were members of the Board, held substantial equity interest in Oxford, allegedly participated directly in disseminating the false and misleading financial statements and other statements, and traded while in possession of material non-public information. Plaintiffs allege sufficiently that these defendants are controlling persons who participated meaningfully in the fraud within the meaning of Section 20(a). *See id.* at 1471, 1473 ("The magnitude of [the] scheme and the degree of oversight needed to coordinate the activities ... supports the district court's determination that the illegal activity could only have occurred at the direction of [the company's] upper-level management.")

Defendants Milligan, Boyd, Smoler and Travers were not members of management but were members of the Board and held equity interest in Oxford. Plaintiffs allege in addition that each possessed information about Oxford's day-to-day operations, computer systems, reserve policies, claims policies and future business prospects. As for their participation in the fraud, each allegedly made substantial trades while in possession of material nonpublic information and Milligan and Boyd allegedly made some of the materially false and misleading statements. Plaintiffs allege sufficiently that these defendants had the power to control the activities which comprise the underlying violation and that they participated in the fraud at least by reaping the benefits of insider trading. As noted by this Court in *In re Executive Telecard, Ltd. Securities Litig.*, 913 F.Supp. 280, 286 (S.D.N.Y.1996), "While a jury may well find that [an individual defendant] did not possess such control over the alleged primary violators, such determination is necessarily fact intensive and cannot be resolved on th[is] motion[ ]."

*Section 20A (Civil Liability for Insider Trading)*

To state a Section 20A claim, plaintiffs must allege an insider trading violation by an individual defendant and trading by the plaintiffs contemporaneously with that individual defendant. *See* 15 U.S.C. § 78t–1 ("Any person who violates any provision of this chapter ... by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold ... securities of the same class.").

An insider trading violation "occurs when a trade is conducted in 'knowing possession' of material nonpublic information." *U.S. v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993). It does not require, as defendants suggest, that a causal connection exist between the knowing possession of the information and the trade, that is, it does not require that the defendant "use" the information when trading. *See id.* (adopting the Commission's "knowing possession" standard over the "knowing possession plus use" standard). The Commission's standard is as follows:

> The Commission also believes that Rule 10b–5 does not require a showing that an insider sold his securities for the purpose of taking advantage of material nonpublic information.... If an insider sells his securities while in possession of material adverse non-public information, such an insider is taking advantage of his position to the detriment of the public.

*Sterling Drug Inc. Investigation*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,570, at 80,298.

It is not disputed that the Individual Defendants all traded during the Class Period. As discussed above, plaintiffs have alleged that the Individual Defendants knowingly possessed material adverse nonpublic information that Oxford's computer system was so deficient that accounting data and

tention. *First Jersey* clearly states that a *prima facie* case requires a showing of culpable partic-

ipation in addition to control status. *See id.* at 1472.

therefore the 1996 Oxford financial statements were unreliable. Plaintiffs also have alleged that the Individual Defendants knew in August 1997 that Oxford's problems were about to be exposed by the NYSID and so they traded shares in order to avoid the precipitous drop in stock value sure to result. The Individual Defendants' trading histories do not indicate that they did not knowingly possess negative non-public information. Their trades during the Class Period were not all in keeping with prior trading and were conducted at suspicious times. Likewise, as noted above, retaining substantial holdings and purchasing or otherwise obtaining shares during the Class period do not vitiate insider trading liability. *San Leandro*, 75 F.3d at 814–15.

 The plaintiffs also have established contemporaneity. The Complaint lists the dates of the Individual Defendant's sales and the named plaintiffs' purchases. Named plaintiffs purchased shares of Oxford common stock on twenty-one of the twenty-five days on which the Individual Defendants sold Oxford common stock during the Class Period. These trades clearly are contemporaneous under any standard. *See In re AST Research Securities Litig.*, 887 F.Supp. 231, 234 (C.D.Cal.1995) (cited by defendants for proposition that where a company's shares are traded at high volume, trades by insider and plaintiff must be same day). As for the other four days, the standard for contemporaneity is a reasonable period. Plaintiffs purchased shares of Oxford common stock within five trading days of those four days. Five trading days is a reasonable period between the insider's sale and the plaintiff's purchase to be considered contemporaneous, considering the last insider trades were in August 1997 and the information remained undisclosed until October 27, 1999. *See In re American Bus. Computers Corp. Sec. Litig.*, [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,839, at 93,055 (S.D.N.Y. Feb. 24, 1994) (Brieant, J.) ("[T]he term 'contemporaneously' may embrace the entire period while relevant material non-public information remained undisclosed.").

## CONCLUSION

Plaintiffs plead scienter for purposes of § 10(b) by pleading strong circumstantial evidence of conscious misbehavior or recklessness. The Court has reviewed all of defendants' arguments against § 10(b) liability and finds them to be without merit. Plaintiffs plead sufficiently both their Section 20(a) claim for controlling person liability and their Section 20A claim for insider trading liability. The Court does not address the arguments related to the Options Traders Subclass. For the foregoing reasons, Oxford's and the Individual Defendants' consolidated motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) is denied.

SO ORDERED.